IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

    Plaintiff,

v.                                                                              No. 14-cr-3762-MCA

**PATRICK DURAN,**

    Defendant.

## ORDER

**THIS MATTER** is before the Court on Defendant Patrick Duran's *Motion to Suppress Statements* filed January 8, 2017. [Doc. 73] The Court has considered the written submissions of the parties, the record, the evidence adduced at the evidentiary hearing held on April 6, 2017 and August 29, 2017, and the pertinent law. The Court, being otherwise fully advised **Grants the *Motion* in-part** and **Denies it in-part**.

**Background**

Defendant Patrick Duran is charged with one count of abandonment or abuse of an Indian Child on the Jicarilla Apache Indian Reservation, causing great bodily harm in violation of NMSA 1978, Section 30-6-1(D)(1); 18 U.S.C. Section 13; and 18 U.S.C. Section 1152. [Doc. 1] Briefly summarized from an affidavit attached to the criminal

complaint, and provided only to place the Court's discussion in context,[1] the factual allegations underlying the charge are the following.

Defendant's girlfriend was the mother of 8 month old John Doe, (the alleged victim in this case, hereinafter "Child"). [Doc. 1 ¶¶ 3, 5-6] Defendant's girlfriend left Child with Defendant while she went to the store. [Doc. 1 ¶ 6] When she returned, Defendant told her that there was something wrong with Child. [Doc. 1 ¶ 6] Defendant explained to his girlfriend that Child had been crying when she left, and that he had placed Child in a crib to let him "cry it out for a while" but, when he checked on Child, he noticed "something different" about Child's breathing and his eyes. [Doc. 1 ¶¶ 6-7] Defendant's girlfriend checked on Child and found him unresponsive. [Doc. 1 ¶ 7] Child was transported by ambulance to the hospital. [Doc. 1 ¶ 7] He was vomiting and he had a bite mark on his arm. [Doc. 1 ¶ 7] At the hospital, an emergency room doctor discovered what appeared to be bleeding on Child's brain. [Doc. 1 ¶ 4] These events occurred on September 28, 2014. [Doc. 1 ¶ 3]

The next day, September 29, 2014, FBI Special Agent William Hall and Criminal Investigator Samson Cowboy interviewed Defendant at the Jicarilla Police Department. [Doc. 1 ¶ 8] During the interview Defendant stated, among other things, that he lost his temper because Child was crying, and he picked Child up "too rough" from a bouncy chair and put him in a crib. [Doc. 1 ¶ 9] He also stated that when he checked on Child later, and found Child unresponsive, he bit Child's arm to elicit a response. [Doc. 1 ¶ 9]

---

[1] None of the information provided in this factual background constitutes a "finding of fact" by the Court. The unproven allegations described in this Section are intended only to provide context for the Court's ensuing discussion.

2

Based on these allegations, among others, Defendant was charged by criminal complaint, as noted earlier. [Doc. 1]

Presently at issue is the admissibility of two sets of statements made by Defendant to FBI agents, Defendant's statement to S.A. Hall and C.I. Cowboy on September 29, 2014, and another statement made by Defendant after he was arrested on October 20, 2014. [8/29/17 Tr. 5, 39-40; Doc. 73 p. 3; Doc. 77 p. 2-3 ¶¶ 4, 6] Defendant seeks to suppress these statements on the ground that Defendant did not receive proper *Miranda* warnings before speaking with the agents. [8/29/17 Tr. p. 40] Additionally, he argues that his September 29, 2014, statements are inadmissible on the ground that they were not given voluntarily. [Doc. 73 p. 4]

**The Law Pertaining to "*Miranda*" Warnings**

Pursuant to the Supreme Court's ruling in *Miranda v. Arizona*, 384 U.S. 436, 444 (1966), an accused person subject to custodial interrogation must be advised of his right to remain silent and the right to have counsel present at the interrogation, among other warnings. The accused may waive these rights, "provided the waiver is made voluntarily, knowingly and intelligently." *Id.* If the accused "indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning. Likewise, if the individual is alone and indicates in any manner that he does not wish to be interrogated, the police may not question him." *Id.* at 444-45. Unless the prosecution demonstrates that it has abided by these procedural safeguards, any statements stemming from the custodial interrogation are inadmissible in a criminal proceeding. *Id.* at 444.

*Miranda* only applies in the context of a *custodial interrogation*—meaning "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* at 444. "[P]olice officers are not required to administer *Miranda* warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect." *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977). Thus, *Miranda* does not apply to a circumstance in which a suspect goes voluntarily to the police station, is informed that he is not under arrest, and, having been interviewed by the police, is permitted to leave. *Id.*

**The Law Pertaining to Involuntary Confessions**

"The Government bears the burden of showing, by a preponderance of the evidence, that a confession is voluntary." *United States v. Lopez*, 437 F.3d 1059, 1063 (10th Cir. 2006). The question of voluntariness turns on "whether the confession is the product of an essentially free and unconstrained choice by its maker[.]" *Id.* (alteration omitted). If so, the confession may be used against him. *Id.* However, if the defendant's confession was not freely made, that is—"if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process" and must be suppressed. *Id.* In making a voluntariness determination, the Court is required to consider "the totality of the circumstances, considering both the characteristics of the accused and the details of the interrogation." *Id.*

4

Our Tenth Circuit recognizes five factors that are particularly relevant in this inquiry: "(1) the age, intelligence, and education of the defendant; (2) the length of detention; (3) the length and nature of the questioning; (4) whether the defendant was advised of his constitutional rights; and (5) whether the defendant was subject to physical punishment." *Id.* at 1063-64. Additionally, with respect to the details of the interrogation, the Court should particularly consider whether the government induced a confession by acts, threats, or promises, that were so inherently coercive as to cause the defendant's will to be overborne. *United States v. Fountain*, 776 F.2d 878, 885 (10th Cir. 1985). In that vein, misrepresentations of law, such as a promise of leniency in exchange for a confession, are considered particularly coercive; whereas misrepresentations of fact, such as an overstatement of the strength of the government's evidence, are generally tolerated. *Clanton v. Cooper*, 129 F.3d 1147, 1158-59 (10th Cir. 1997), *overruled on other grounds*, *Becker v. Kroll*, 494 F.3d 904 (10th Cir. 2007).

**Findings of Fact**

From evidence adduced over the course of a two-day evidentiary hearing held on April 6, 2017 and August 29, 2017 at which FBI Special Agent William Hall (S.A. Hall), and FBI Special Agent Mark Buie (S.A. Buie) were called as witnesses for Government; and at which Defendant and Doctor Clifford Morgan, Ph.D were called as witnesses for the defense, the Court finds the following.

1. S.A. Hall is an FBI supervisory special agent who has been with the FBI for 19 years.

2. On September 29, 2014, upon S.A. Hall's request, a Jicarilla police officer went to Defendants residence and asked Defendant whether he was willing to speak with S.A. Hall. The request was made in person because S.A. Hall did not have Defendant's phone number. Defendant responded to the interview request by driving himself to the Jicarilla Police Department in Dulce, New Mexico.
3. The Jicarilla Police Department has interrogation rooms and a conference room. The interrogation rooms have non-rolling chairs for suspects, an area to handcuff a suspect to a bar, and no windows; the conference room has dark brown leather rolling chairs, a long table, a window, and is the part of the police station in which the chief and his staff meet. Defendant, S.A. Hall, and Criminal Investigator Samson Cowboy met in the conference room instead of an interrogation room and, for approximately twenty minutes, S.A. Hall interviewed Defendant. The conference room door remained unlocked for the pendency of the interview.
4. Defendant was age 26, he appeared to S.A. Hall to be sober, not injured, and to have no difficulty speaking, communicating, or understanding.
5. The interview was tape recorded. Having listened to the tape recording, the Court finds that, in speaking with Defendant, S.A. Hall spoke in a calm tone of voice, and was not aggressive.
6. After S.A. Hall asked Defendant some preliminary questions (for example, date of birth and address), S.A. Hall said to Defendant, "When we're done,

you're going to walk out the door." He also told Defendant "you're not under arrest"; and "Since you come over on your own power, you're sitting over there, and you can just—you know, you can basically get up and walk out." [Gov. Ex. 1 p. 3-4] Defendant understood these comments to mean that he could leave the conference room at any time.

7. Defendant responded by saying, "Well, I have nothing to hide," whereupon, S.A. Hall began to discuss, and ask Defendant questions about, the circumstances of the previous day that led to Child's injury. [Gov. Ex. 1 p. 4-6]

8. In this interview, Defendant stated, among other things, that he had "picked [Child] up . . . too damn rough"; and that he had bitten Child when Child "wasn't responding." [Gov. Ex. 1 p. 13-14, 16]

9. Throughout course of the interview, S.A. Hall and C.I. Cowboy (who remained in the room, but did not interact with Defendant directly) were polite and professional toward Defendant; they did not threaten him, promise him leniency in exchange for a confession, physically punish him, or otherwise act overbearingly.

10. After the interview, Defendant left the Jicarilla Police Department.

11. S.A. Buie is a supervisor for the Santa Fe resident agency of the FBI who has been employed by the FBI for 17 years.

12. On October 20, 2014, S.A. Buie arrested Defendant.

13. S.A. Buie's interactions with Defendant were tape recorded and, having listened to the recording, the Court finds that, in his interaction with Defendant, S.A. Buie's tone of voice was calm and professional.

14. To effect the arrest, S.A. Buie, along with six FBI agents went to Defendant's residence. When the agents arrived, Defendant went outside to meet them, and Agent Buie handcuffed him.

15. Moments later, Agent Buie ordered one of his fellow agents to remove Defendant's handcuffs so that Defendant's hands would be free to sign a "*Miranda* form."[2]

16. Although S.A. Buie had the *Miranda* form on hand, instead of reading it to Defendant, he commenced the following exchange on the topic of Defendant's *Miranda* rights:

    S.A. Buie: I'm just going to read you your rights, just so you know them. You know, you know you don't have to talk to me. If I do ask you any questions . . . I really don't plan on asking you many questions. But if you do, you don't have to talk to me, if I do speak you. But if you do say anything to me, you know the deal, anything can be used against you--

    Defendant: Yeah. Yeah.

    S.A. Buie: against you in court.

    . . .

---

[2] For continuity the Court adopts S.A. Buie's parlance, and refers to the "*Miranda* form"; the Court notes, however, that the document is titled "ADVICE OF RIGHTS." [Gov. Ex. 3]

S.A. Buie: If you should say anything to me. And I know [S.A. Hall] explained these rights to you before.

Defendant: Actually, he didn't, but I know my rights.

S.A. Buie: Well, I'll tell him to anyway. You have the right to speak to a lawyer for advice before we ask any questions. And if you . . . the cool thing is if you can't afford a lawyer, you're going to get one appointed to you tomorrow.

Defendant: Tomorrow?

S.A. Buie: Yeah. Tomorrow you're going to get a lawyer appointed to you. So—

Defendant: Oh, shit.

S.A. Buie: And if you do . . . if we do start talking to you or if we do start talking and you start answering questions, if you start getting nervous and you don't want to talk to us anymore, just shut-up. Say—

Defendant: It's all good.

S.A. Buie: You don't have to talk anymore. Okay? I think you understand them, right? You've been arrested before but nothing violent, right?

Defendant: Yeah.

. . .

S.A. Buie: Okay. So, you understand your rights as I've explained them to you. So, go ahead and sign right there, that you understand.

[Gov. Ex. 4 p. 3-5]

17. Defendant then signed the *Miranda* form. [Gov. Ex. 3]

18. Moments later, S.A. Buie advised Defendant that he would be taken to a "county lock-up" in Santa Fe, and that agents would pick him up from jail the next morning and take him to his initial appearance before a Magistrate, "after [which] appearance, you're going to be assigned a lawyer . . . if you can't afford one." Defendant assented, stating, "All right." [Gov. Ex. 4 p. 6]

19. Having told Defendant twice that his first opportunity to speak with a lawyer would be "tomorrow" and having further advised Defendant that he would be appointed a lawyer only *after* being taken to court for an initial appearance before a Magistrate, S.A. Buie led Defendant into a conversation about the underlying circumstances of the charged crime. At first, Defendant demurred, stating, "I kind of don't want to talk about it." However, after S.A. Buie repeatedly emphasized that Child had not suffered "permanent damage" and that Child was "okay"; and observed that Defendant had not done "it nearly as others do it. So, you know, you checked yourself, right?[,]" Defendant made some ostensibly self-incriminating statements. [Gov. Ex. 4 p. 8-9, 20-21

20. Defendant is dyslexic and he was in special education in high school. He testified that, although he can read, he does not understand what he reads. At the time of the hearing, Defendant was enrolled in an auto mechanics course.

21. Defendant testified that he did not read the *Miranda*, or "waiver of rights," form that S.A. Buie presented to him. He testified further that he does not know the definition of "waiver."

22. According to Defendant, he was not being truthful when he told S.A. Buie that he knew his rights.

23. Defendant wanted an attorney and, although S.A. Buie had told Defendant that he did not have to talk to him, Defendant responded to S.A. Buie's inquiries because did not want "to be rude" to or "ignore" S.A. Buie, who kept talking to him.

24. In regard to the testimony discussed in the four preceding findings, the Court found Defendant credible.

25. Dr. Morgan is a psychologist who has been in private practice since 1991. His practice includes performing accommodations evaluations and psychological evaluations for the Department of Vocational Rehabilitation (DVR). The Court finds Dr. Morgan's testimony to be credible.

26. Dr. Morgan met with Defendant to perform a DVR evaluation on March 18, 2016. The meeting came about because Defendant, who was having difficulty in his auto mechanics course, was referred to Dr. Morgan for an evaluation of the extent of Defendant's learning disabilities.

27. Dr. Morgan concluded that Defendant's overall reading ability is "severely impaired" that is, Defendant reads at a beginning third-grade level. Defendant's spelling ability is at a second grade level, and his writing/essay ability is at a seventh grade level.

28. As a result of the evaluation, Dr. Morgan concluded that Defendant needs accommodations in his vocation.

29.  Dr. Morgan also concluded that Defendant requires a particular accommodation in which information, such as tests and reading materials involved in his course work, must be read to him so that he can understand it.

30.  The *Miranda* form that Defendant signed included the sentence: "You have the right to remain silent."  In Dr. Morgan's opinion (an opinion elicited by the government), that sentence requires a fourth grade reading level.

31.  Based upon Defendant's testimony that he did not read the *Miranda* form, viewed together with Dr. Morgan's testimony about Defendant's reading ability, the Court concludes that Defendant did not, and indeed he could not, read and comprehend the *Miranda* form.

**Analysis**

### I.  *The Statements that Defendant Made on September 29, 2014, at the Jicarilla Police Department Shall Not Be Suppressed*

Defendant's September 29, 2014, interview did not constitute a custodial interrogation, therefore, *Miranda* does not apply.  *Miranda* only applies in the context of a *custodial interrogation*—meaning "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."  *Miranda*, 384 U.S. at 444.   On September 29, 2014, Defendant, having been asked by a police officer whether he would meet with S.A. Hall, voluntarily drove himself to the Jicarilla Police Department.  *See Mathiason*, 429 U.S. at 495 (concluding that the defendant went to the police station "voluntarily" where a police officer left a card at his residence with a note asking him call, and subsequently asking

him to go into the police station to "discuss something"). Before asking Defendant any question relevant to the investigation into Child's injury, S.A. Hall expressly advised Defendant that he was not under arrest, and that he could "basically get up and walk out." These comments are "powerful evidence" that a reasonable person would have understood that he was free to leave the interview.[3] *United States v. Jones*, 523 F.3d 1235, 1240 (10th Cir. 2008) ("That a person is told repeatedly that he is free to terminate an interview is powerful evidence that a reasonable person would have understood that he was free to terminate the interview."). Indeed, Defendant testified that he understood that he could leave the interview at any time and, having stated that he had "nothing to hide" Defendant spoke with S.A. Hall for approximately twenty minutes. After the interview, Defendant left the Jicarilla Police Department. These facts are further indicia that the September 29, 2014, interview was noncustodial. *See Mathiason*, 429 U.S. at 495 (holding that the defendant was "not in custody or otherwise deprived of his freedom of action in any significant way" where he was interviewed for thirty minutes and left "the police station without hinderance" afterward.). Considering the totality of the circumstances of the September 29, 2014, interview, the Court concludes that Defendant was not "in custody." Accordingly, the statements that Defendant made during that

---

[3] While S.A. Hall also told Defendant that, "[w]hen we're done, you're going to walk out the door" which comment "resounds more as a compulsion that he is not leaving until he talks," *United States v. Fred*, 322 Fed. Appx. 602, 607 (10th Cir. 2009), in light of the surrounding facts demonstrating S.A. Hall's communication of Defendant's freedom to leave the interview, and Defendant's testimony regarding his understanding thereof, this comment does not affect the Court's conclusion.

interview shall not be suppressed on the ground that Defendant was not given *Miranda* warnings.

Nor will the Court suppress Defendant's September 29, 2014 statements on the ground that they were given involuntarily. At the time of this interview, Defendant was a twenty-six year old with a high school education who appeared to be sober, capable of understanding S.A. Hall's questions, and clearly communicating appropriate answers. Because he was not asked to read or write during this interview, Defendant's learning disability is not relevant to the issue whether his September 29, 2014, statements were voluntary. Furthermore, the Court does not find that the circumstances of the interview were inherently coercive. The length of the interview, which lasted only twenty minutes, was relatively short compared with the length of interviews that the Supreme Court and our Tenth Circuit have held to be non-coercive. *See*, *e.g.*, *Berghuis v. Thompkins,* 560 U.S. 370, 387 (2010) (holding that a three hour interrogation was not coercive); *United States v. Varela*, 576 Fed. Appx. 771, 779 (10th Cir. 2014) (relying on *Berghuis* to support a holding that that the defendant's two and a half hour interview was non-coercive). As discussed, Defendant, who had voluntarily presented himself for the interview, was not in "detention"; he was not subjected to physical punishment, nor did S.A. Hall or C.I. Cowboy use threats or promises to induce a confession. *See Lopez*, 437 F.3d at 1063 (stating that the length of "detention" and the use physical punishment are factors that should be considered, among others, in regard to the voluntariness of the defendant's statements); *Fountain*, 776 F.2d at 885 (stating that in regard to the details of the interrogation, the Court's should be whether the government induced a confession by

acts, threats, or promises, that were so inherently coercive as to cause the defendant's will to be overborne). Considering the totality of the foregoing circumstances, Defendant's statements on September 29, 2014, were voluntarily given, and shall not be suppressed.

II. *The Statements that Defendant Made on October 20, 2014, Shall Be Suppressed*

Unlike the interview that took place at the Jicarilla Police Department, Defendant's October 20, 2014, interview, which occurred after he had been arrested, was "custodial." *Miranda*, 384 U.S. at 444 (defining "custodial interrogation" as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way"). Accordingly, the government has the burden of demonstrating that any statements made by Defendant during that interview were made pursuant to Defendants *knowing* and *intelligent* waiver of his *Miranda* rights. *Miranda*, 384 U.S. at 479. Considering the circumstances of, and pertinent to, the October 20, 2014, interview, the Government has not satisfied this requirement.

Three aspects of the October 20th interview lead the Court to conclude that Defendant did not knowingly and intelligently waive his *Miranda* rights before he made ostensibly incriminating statements to S.A. Buie. First, having announced that he would "read" Defendant his rights "just so you know them," S.A. Buie forewent his option to read the form to Defendant and chose, instead, to paraphrase the rights enumerated on the form. To illustrate the significance of S.A. Buie's departure from his original plan of reading Defendant's rights to him, the *Miranda* form read as follows:

**YOUR RIGHTS**

> Before we ask you any questions, you must understand your rights.
>
> You have the right to remain silent.
>
> Anything you say can be used against you in court.
>
> You have the right to talk to a lawyer for advice before we ask you any questions.
>
> You have the right to have a lawyer with you during questioning.
>
> If you cannot afford a lawyer, one will be appointed to you before any questioning if you wish.
>
> If you decide to answer questions now without a lawyer present, you have the right to stop answering at any time.

[Gov. Ex. 3]

Agent Buie's explanation of Defendant's rights, on the other hand, was the following:

> You know, . . . you don't have to talk to me. If I do ask you any questions . . . I really don't plan on asking you many questions. But if you do, you don't have to talk to me, if I do speak you. But if you do say anything to me, you know the deal, anything can be used against you . . . in court.
> . . .
>
> You have the right to speak to a lawyer for advice before we ask any questions. And if you . . . the cool thing is if you can't afford a lawyer, you're going to get one appointed to you tomorrow.
> . . .
>
> Tomorrow you're going to get a lawyer appointed to you.
>
> . . .
>
> . . . if we do start talking and you start answering questions, if you start getting nervous and you don't want to talk to us anymore, just shut-up.
>
> . . .
>
> You don't have to talk anymore. Okay? I think you understand them, right?

While there is not a legal requirement that *Miranda* warnings be given to Defendant in a "precise form[,]" the defendant must, at the least, have been provided a "fully effective equivalent." *California v. Prysock*, 453 U.S. 355, 359 (1981) ("This Court has never indicated that the 'rigidity' of *Miranda* extends to the precise formulation of the warnings given a criminal defendant"; however, in the absence of the precise warnings, a "fully effective equivalent" is a prerequisite "to the admissibility of any statement made by a defendant."). S.A. Buie's version did not constitute a "fully effective equivalent" of the rights set forth in *Miranda* or in the *Miranda* form that S.A. Buie had on hand. *See Miranda*, 384 U.S. at 479 ("[A Defendant] must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires."). Specifically, S.A. Buie's advice to Defendant that he would get a lawyer appointed to him "tomorrow" is not a fully effective equivalent to telling Defendant that he had the right to have a lawyer with him *during questioning* and that, if Defendant could not afford a lawyer, one would be appointed to him *before any questioning*. Nor was S.A. Buie's advice to Defendant that if he started to get "nervous" and did not want to talk to the FBI agents "anymore" that he should "just shut-up" a fully effective equivalent to advising Defendant that if he decided to answer questions without a lawyer present, he had the right to stop answering at any time.

17

Secondly, in advising Defendant of his rights and in his later discourse with Defendant, S.A. Buie conveyed that Defendant would be provided with legal counsel at a *future point in time*. In his initial advice to Defendant, S.A. Buie twice told Defendant that he would get a lawyer appointed to him "tomorrow." And, in their later discourse, S.A. Buie told Defendant that a lawyer would be "assigned . . . tomorrow or the next day" and that he would "have a lawyer within the next day or so." As a matter of law, this explanation of Defendant's right to counsel was not adequate. *See Prysock*, 453 U.S. at 360-61 (referring to the right to appointed counsel as something that will be provided at "a future point in time" is not adequate to advise the suspect of his right to appointed counsel before an interrogation).

Finally, the Government urges the Court to rely upon the signed *Miranda* form and/or upon the fact that Defendant said, "I know my rights," as proof that Defendant was apprised of, and waived his *Miranda* rights. The Court recognizes that a defendant's signature on "an express written statement of waiver, such as the 'advice of rights' form . . . is strong proof of the waiver's validity." *United States v. Boyd*, 31 Fed. Appx. 601, 603 (10th Cir. 2002). However, in light of Defendant's inability to read and comprehend the *Miranda* form, the verbal warnings were crucial to Defendant's ability to make a knowing and intelligent choice to waive or to exercise his *Miranda* rights. *See North Carolina v. Butler*, 441 U.S. 369, 378 n.7 (1979) (Brennan, J. dissenting) ("[I]f [the defendant] could not read, oral warnings were the only ones that mattered, and it thus becomes highly relevant whether he was told of his rights at the time he was interrogated."). Further, the fact that Defendant expressed surprise (evidenced by his

18

expletive reaction upon hearing it) that he would be appointed a lawyer "tomorrow," and in light of his testimony that he does not know the definition of "waiver," the Court cannot, in the context of this case, reasonably rely on Defendant's dismissive, "I know my rights," comment to S.A. Buie to conclude that he, in fact, understood his *Miranda* rights.

In sum, S.A. Buie's oral explanation of Defendant's *Miranda* rights was inadequate. And, considering the totality of the circumstances, neither the fact that Defendant told S.A. Buie that he knew his rights, nor the fact that he signed the *Miranda* form are persuasive evidence that Defendant's statements to S.A. Buie were made pursuant to a *knowing* and *intelligent* waiver of his right to have counsel present before and during his ensuing custodial interrogation. Accordingly, the statements that Defendant made to S.A. Buie on October 20, 2014, shall be suppressed.

**CONCLUSION**

For the reasons stated herein, Defendant's *Motion to Suppress Statements* filed January 8, 2017 [Doc. 73] is hereby **Denied-in-Part** and **Granted-in-Part** as follows:

1) As to the statements that Defendant made on September 29, 2014, at the Jicarilla Police Department, the *Motion to Suppress Statements* is **DENIED;**

2) As to the statements that Defendant made on October 20, 2014 to S.A. Buie, the *Motion to Suppress Statements* is **GRANTED.**

**IT IS SO ORDERED** this 8th day of November, 2017, in Albuquerque, New Mexico.

_____
 **M. CHRISTINA ARMIJO**
  **Chief United States District Judge**