1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF NEW MEXICO

3    _____
                              )
4    UNITED STATES OF AMERICA, )   No. 1:14-CR-03762-WJ
                              )
5            Plaintiff,        )
                              )   Pete V. Domenici U.S. Courthouse
6        vs.                   )   Bonito Courtroom
                              )   Albuquerque, New Mexico
7    PATRICK DURAN,            )   Monday, August 26, 2019
                              )   10:00 A.M.
8            Defendant.        )
     _____)

9

10                  TRANSCRIPT OF PROCEEDINGS
         DAUBERT HEARING RE: DEFENDANT'S PROPOSED EXPERT
11                          VOLUME 3
          BEFORE THE HONORABLE WILLIAM P. JOHNSON
12            CHIEF UNITED STATES DISTRICT JUDGE

13

14   APPEARANCES:

15   For the Plaintiff:  KYLE NAYBACK
                         NICHOLAS MARSHALL
16                       UNITED STATES ATTORNEY'S OFFICE
                         District of New Mexico
17                       Post Office Box 607
                         Albuquerque, New Mexico   87103
18

19   For the Defendant:  DONALD KOCHERSBERGER
                         BUSINESS LAW SOUTHWEST, LLC
20                       320 Gold Avenue, S.W., Suite 610
                         Albuquerque, New Mexico 87102
21
                             and
22
                         JOHN MOON SAMORE
23                       SAMORE LAW
                         P.O. Box 1993
24                       Albuquerque, New Mexico   87103

25

```
 1  Reported by:        MARY K. LOUGHRAN, CRR, RPR, NM CCR #65
                        United States Court Reporter
 2                      Phone:  (505)348-2334
                        Email:  Mary_Loughran@nmcourt.fed.us
 3

 4       Proceedings reported by machine shorthand and transcript

 5  produced by Computer-Aided Transcription.

 6                          *  *  *  *  *

 7                          I N D E X

 8                        W I T N E S S

 9                                                        Page

10  JOSEPH SCHELLER

11     DIRECT REBUTTAL EXAMINATION BY MR. KOCHERSBERGER ...9

12     CROSS REBUTTAL EXAMINATION BY MR. MARSHALL ........72

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                       I N D E X

 2   EXHIBITS                  FORMALLY MARKED/IDENTIFIED

 3   No.                                          Page

 4   Defendant's 29   Article 22 of Defendant's Notice of   33
                      Foundational Materials by Dr. Cho
 5
     Defendant's 30   Article 16 of Defendant's Notice of   35
 6                    Foundational Materials by K.S. Lee

 7   Defendant's 31   Article 18 of Defendant's Notice of   37
                      Foundational Materials by K.S. Lee,
 8                    et al.

 9   Defendant's 32   Article 19 of Defendant's Notice of   37
                      Foundational Materials by K.S. Lee
10
     Defendant's 33   Article 20 of Defendant's Notice of   37
11                    Foundational Materials by K.S. Lee

12   Defendant's 34   Article 28 of Defendant's Notice of   42
                      Foundational Materials by Hee Chang
13                    Lee, et al.

14   Defendant's 35   Article 31 of Defendant's Notice of   42
                      Foundational Materials by L.C.
15                    Hellbusch and J. Neurosurg

16   Defendant's 36   Article 30 of Defendant's Notice of   42
                      Foundational Materials by U.S.
17                    Wiig, et al.

18   Defendant's 37   Article 29 of Defendant's Notice of   55
                      Foundational Materials by D.
19                    Wittschieber

20   Defendant's 40   Article 27 of Defendant's Notice of   71
                      Foundational Materials by R. Minns,
21                    et al.

22   Government's 31  Dr. Rooks article                    111

23                        *  *  *  *  *

24

25
```

1  (In Open Court at 10:15 A.M.)

2          THE COURT:  This is United States vs. Patrick Duran,

3  14-CR-3762.

4          Would counsel enter their appearances for the record.

5          MR. MARSHALL:  Good morning, Your Honor.  Nicholas

6  Marshall and Kyle Nayback for the United States.

7          MR. KOCHERSBERGER:  Good morning, Your Honor.  Don

8  Kochersberger and John Samore on behalf of Mr. Duran, who is

9  present.  Dr. Joseph Scheller, the witness for today, is also

10  in the gallery.

11          THE COURT:  All right.  Let me handle a couple of

12  preliminary things before we continue with Dr. Scheller's

13  testimony.

14          I took under advisement a previous objection to the

15  scope of Dr. Hart's testimony.  Dr. Hart was the treating

16  physician of the child.  He was not identified by the

17  Government as an expert witness, and so there was an objection

18  raised about Dr. Hart giving expert opinions because he wasn't

19  identified as an expert witness.

20          I've decided to sustain the Defendant's objection.

21  So Dr. Hart's testimony will be, in this case, will be limited

22  to his role as the neuroradiologist in the case.  However, in

23  his area, in terms of a treating physician, he had to make

24  decisions, and he made conclusions in the context of serving as

25  a treating physician.  So he will be allowed to give testimony

1    about his conclusions and what he did as a treating physician.

2              And some of that -- again, with medical doctors, it

3    seems like there's always a little bit of overlap in terms of a

4    fact witness giving some opinion testimony, but that's just the

5    nature of the training that they undergo.  In the course of

6    treatment, they have to make and draw conclusions, and he's

7    going to be allowed to explain why he did what he did as a

8    treating physician.  So I'll follow that up with a written

9    order.

10             Now, there was also -- I mean, I understand the

11   Government's motion to strike some of the, I think it was some

12   of the exhibits that the defense submitted in advance of this

13   hearing.  I was trying to explain -- Document 166, which was

14   the Memorandum, Opinion and Order Overruling Defendant's

15   Objection to the Scope of the Daubert Motion and Granting

16   Defendant's Request to Present Rebuttal Testimony, I went

17   through it and I believe it's on Pages 3 and 4 that there was

18   an issue about whether the defense was reading the Government's

19   Daubert motion to only focus on two aspects of Dr. Scheller's

20   opinions.  That was that victims of child abuse are often found

21   to have unexplained bruises, rib and limb fractures, scalp

22   injuries, brain injuries and neck injuries, and that most

23   subdural hygromas are not related to accidental or abusive

24   trauma.

25             I ruled in favor of expanding -- in favor of the

1    Government on the overall objection that Dr. Scheller should

2    not be allowed to testify based on Daubert and its progeny, in

3    part because of methodology.  And so in that regard, I'm

4    allowing Dr. Scheller to do rebuttal testimony today in

5    connection with allowing the record to be fully developed.

6            I'm overruling the Government's recent Motion to

7    Strike the Notice of Foundational Material for testimony.

8            And then at the conclusion of the hearing, and I've

9    got an order that's in the process of being finalized, but I'm

10   going to require, because of the -- again, this Daubert, I

11   think the initial hearing was back in November.  So I'm going

12   to require written closings, and I've set forth a schedule.

13   I'm going to have the United States go first, since it's the

14   United States' motion, and then defense, and then the

15   Government may reply, and then I'm going to issue a written

16   ruling on this.

17           I want to try to get this done as soon as possible,

18   because I think this case needs to be prioritized.  I mean,

19   again, it's a difficult situation, and we're down -- we've got

20   three judicial vacancies, and this isn't the only criminal case

21   I've got by any stretch of one's imagination.  But it's a 2014

22   case, and so I'm prioritizing this case in terms of bringing it

23   to resolution one way or the other.

24           Anyway, that's how I intend to proceed.  So with

25   that, you may -- oh, yes, Mr. Marshall.

1       MR. MARSHALL:  Your Honor, I have a question.  In

2  your order, Document 146, you had excluded a large number of

3  defense's literature that they had attempted to supplement

4  after the first hearing.  I just want to make sure the Court's

5  order today, I just want to make sure I'm not misreading.  Does

6  that overrule the previous order?  Because much of what defense

7  filed in the notice that didn't actually get filed is

8  overlapping articles.  So, many of those articles had

9  previously already been excluded by the Court under

10 Document 146, and it looked like a second attempt by defense to

11 get those articles in before the Court.

12      And so I didn't know if the Court's new order is

13 overruling 146, so that everything comes in, or if the articles

14 and information that have previously been excluded are still

15 excluded.

16      THE COURT:  Well, again, I'm not interested in -- as

17 a general rule, you know, once a trial Judge rules, I'm not

18 interested in an end run around a ruling.  But again, the

19 problem is there was this issue over the scope of the overall

20 Daubert motion.

21      So I'm going to give you a standing objection on it.

22 I'm going to allow this testimony to go forward so there's a

23 record developed, and then I think to the extent that the

24 Government is claiming that the defense is doing an end run

25 around an earlier ruling and that those matters should not be a

1   part of the record, or should not be considered, then that's

2   why I'm having the order on the written closings handled that

3   way.

4           MR. MARSHALL:  Okay.

5           THE COURT:  So I'm going to allow the record to be

6   made so it's of record, and then when you all walk out of here

7   today, there's going to be an order on how the written closings

8   are going to be handled.  And then at that point, I'm going to

9   issue a ruling on the original Daubert motion.

10          So with that, you may call Dr. Scheller.

11          MR. KOCHERSBERGER:  Two things briefly before I call

12  Dr. Scheller, Your Honor.  With respect to the articles,

13  Document 146 excluded them because Dr. Scheller didn't mention

14  them.  So obviously our intent today is to have him mention the

15  things that are important so that they don't have to be

16  excluded.

17          THE COURT:  Right, but I'm not going to prohibit them

18  from raising an issue about --

19          MR. KOCHERSBERGER:  I understand.

20          THE COURT:  All right.

21          MR. KOCHERSBERGER:  I just wanted to make clear why I

22  don't think I'm circumventing your order.  I'm trying to help

23  comply with your order.

24          Secondarily, I think that the reason that this thing

25  may have expanded beyond sort of out of controlness is that I

1  think Dr. Scheller, in other cases, has had opinions about the

2  diagnosis of AHT, sort of in general, and whether or not that

3  should be a good thing and all these sorts of things.  He's not

4  testifying about that in this case, and it's not part of the

5  opinion that we filed.  So I just want to make clear that

6  that's not what we're trying to do here.  And we'll have

7  Dr. Scheller come up and testify, but within the scope of

8  notice that we filed.

9           THE COURT:  All right.

10           MR. KOCHERSBERGER:  The defense will call

11  Dr. Scheller.

12           (JOSEPH SCHELLER, DEFENSE WITNESS, SWORN)

13           MR. GARCIA:  Please have a seat, sir, and state your

14  full name for the record.

15           THE WITNESS:  Joseph Scheller.  S-c-h-e-l-l-e-r.

16                DIRECT REBUTTAL EXAMINATION

17  BY MR. KOCHERSBERGER:

18  Q.   Good morning, Dr. Scheller.

19  A.   Hello.

20  Q.   As you recall, you testified in this same case back in, I

21  think it was November; right?

22  A.   Yes, sir.  2018.

23  Q.   So I'll try not to go over the same material to the extent

24  that we can avoid that, but some of it may be foundational,

25  including what I want you to talk about a little bit right now,

1   which is just, what is your specialty within medicine?

2   A.   I'm a pediatric neurologist.  So that's a specialist

3   pediatrician in diseases of the brain, spinal cord, nerves,

4   muscles, and development.

5   Q.   And as part of that professional specialization, what have

6   you done in your medical career professionally?  Like, what

7   type of practice do you have?

8   A.   For most of my 32 years, I've been working for children's

9   hospitals, and that was in San Diego, California, in University

10  of Maryland in Baltimore, and then at Children's Hospital in

11  Washington, D.C.

12       And what I'm doing in those places is, I'm seeing

13  inpatients with severe neurological problems, children who

14  might have brain infections or strokes, or have been in bad car

15  accidents.  And then I also see outpatients, which are either

16  follow-ups from the hospitalization or are more minor things

17  like headaches, episodes of fainting, back pain, questions of

18  development, that kind of thing.

19  Q.   Do you -- is your practice specific to child abuse cases?

20  A.   No, no, no, not at all.  In fact, that's a small

21  percentage of all the cases that I've seen in my practice over

22  the 32 years.

23  Q.   Did you have an opportunity to review Dr. Strickler's

24  testimony from the last time we held a portion of this hearing?

25  A.   Yes, sir.

1  Q.    Are you familiar with Dr. Strickler's medical specialty?

2  A.    Sure.   That is child abuse pediatrics.

3  Q.    How does your practice differ from that of a child abuse

4  pediatrician?

5  A.    Child abuse pediatricians get extra training.   Every

6  pediatrician is trained to recognize child abuse, or suspicious

7  findings that suggest child abuse.   Child abuse pediatricians

8  get extra training in recognizing those, and that involves

9  possibly maltreatment via sexual problems, via feeding

10  problems, via physical force, emotional force.   So child abuse

11  is sort of a broad type of -- it presents with a broad range of

12  possible findings or issues that suggest it.

13      Child neurology -- so, one small part of child abuse

14  pediatrics is diagnosing abusive head trauma.   Child neurology

15  is involved with all aspects of head trauma.   So that could be

16  accidental falls, it could be children who stop breathing as

17  part of a seizure, it could be children who did suffer physical

18  abuse.   So you get to see the whole spectrum of head injury and

19  brain problems, and not just the ones that are suspicious for

20  abusive head trauma.

21  Q.    One of the things that we're here to talk about is the

22  methodology that you employed to reach the various conclusions

23  that you have in this case.   I want you to talk, first, about

24  in your regular practice of medicine, what is the methodology

25  you use to come to medical conclusions?

1   A.   So, you get the best history that you can as far as the

2   medical problem, and that could be a story from the patient, if

3   it's an older patient, or from the caregiver, a mom or dad if

4   it's a younger patient.   Then one performs a physical exam in

5   order to try to narrow down where the problem might be based on

6   what you learn from the history.   One then does laboratory

7   tests, which are usually blood and urine tests.   They might

8   also be, in the case of a neurologist, brain wave tests or

9   other electrical tests that neurologists do.

10         So that's part number three.   History, physical,

11   laboratory tests.   And then radiology, which is just imaging.

12   Take pictures of body parts that you think might be affected,

13   and then try to see if those pictures are relevant to a

14   diagnosis.

15   Q.   Is that widely accepted as the way all physicians do

16   diagnosis?

17   A.   Oh, yes, sir.

18   Q.   Does your -- first of all, you said you reviewed

19   Dr. Strickler's testimony, and I think she testified quite a

20   bit about the methodology she used to reach her conclusions.

21   Did your methodology that you used to reach your conclusions

22   differ from hers in any way?

23   A.   No, only from our experience.   But we actually used the

24   same methodology.

25   Q.   One of the things that Dr. Strickler was able to do that

1   you weren't was to observe the patient in this case personally.

2   First of all, how often does that happen in your practice?

3   A.   It rarely happens.  In other words, I do phone consults

4   and I do consults by Skype, or those types of things.  But it's

5   rare.  Ideally one would like to see the child who is having

6   the problem and do a hands-on physical examination, and

7   Dr. Strickler did have that advantage.  She was able to do that

8   and I was not.

9   Q.   In some situations, do you still render diagnosis despite

10  the fact that you haven't seen the patient personally?

11  A.   Yes, both clinically based on descriptions of what I hear

12  from treating physicians, let's say in an emergency or in

13  another clinic, or based on reviewing the record weeks or

14  months later.

15       For example, there are children who, let's say -- I'm in

16  Maryland.  Let's say a child was living in another state and

17  had the whole neurological problem and hospitalization in that

18  other state, and then moved and now they're coming to me for

19  either a second opinion or continuing care.  So I would need to

20  review everything that they had undergone in the other state,

21  and that would be the history, the physical exam, the

22  laboratory tests, and the radiology, and then either agree with

23  the previous diagnosis or say, perhaps they didn't consider

24  something and you might consider this diagnosis.

25       So it does happen in my real practice.  And then I do

1  medical-legal work like this one, and certainly it happens a

2  lot in medical-legal.

3  Q.   Is there anything that you lose in the process by not

4  having personally observed the patient, and if so, what would

5  those things be?

6  A.   Well, it's almost like an interview, a job interview, or a

7  date, you know.  There's only so much that you can get from the

8  information that you read online or that you're reading from

9  data about a person.  And then when you get to meet a caregiver

10 or a child, then you just get a better sense, you can get a

11 better sense of what's going on.

12 Q.   Is there anything you gain by not having that personal

13 contact?

14 A.   Yes.  And that is, very often while you're in a hospital

15 setting and there's a lot of urgency and excitement about

16 what's going on, people will say things that are not exactly

17 accurate.  They might try to give you their impression, which

18 is not an unbiased impression.  And so in that, I'll call

19 thrill of the moment, one might struggle to see a bigger

20 picture.  And that's something that if you wait a week or a

21 month or several months and then review the medical records,

22 then you're out of that sense of urgency and you can really

23 analyze all the findings.

24 Q.   For your job in diagnosing pediatric neurology issues, is

25 there a particular diagnostic sort of framework that you

1  utilize?

2  A.   I didn't understand the question.

3  Q.   I think that you had told me in earlier times, you called

4  it a diagnostic puzzle, but it's a sort of framework that you

5  use to diagnose neurological issues.  I think you may have

6  touched on it earlier in answering one of my other questions.

7  But I wanted to be clear as to what that was, since your

8  methodology is what we're largely talking about here.

9  A.   Right.  So I would call it a four-pronged puzzle or

10  four-pieced puzzle, if we're imagining a child's puzzle, and

11  piece number one is what you learn from the history, and

12  sometimes that leads a person straight into a diagnosis.  And

13  sometimes it's what you learn from the physical exam, and that

14  leads a person straight into a diagnosis.  Laboratory studies,

15  like blood tests, urine tests, electrical tests, that can lead

16  somebody into a diagnosis.  And then the fourth are the

17  pictures, the images.

18       So sometimes it's one of those four, but in most cases

19  it's a combination of the four.  So you take the history,

20  physical, laboratory tests and radiology, put them in

21  combination, and then based on experience and training, you

22  say, well, that leads to my diagnosis, or possibility of

23  diagnosis of this and possibly other things.

24  Q.   Is that something peculiar to you or is that just sort of

25  how medicine works?

1          MR. MARSHALL:  Objection, Your Honor.  It seems like

2   we're starting over from the very beginning of Daubert.  We

3   have not progressed to where we're rebutting the information

4   that has come in with the other -- rebutting the information

5   that we're supposed to be doing at this point.  This seems like

6   a brand new recitation of a rebuttal direct testimony -- or I'm

7   sorry, a Daubert direct testimony.

8          THE COURT:  What's your response?

9          MR. KOCHERSBERGER:  I have three more questions about

10  the background with respect to the methodology that he

11  utilized, and then we are going to get into his specific

12  opinions.

13         THE COURT:  All right.  As long as you're moving in

14  that direction fairly quickly, then I'll overrule.

15         MR. KOCHERSBERGER:  My concern was just that it's

16  been almost a year since he was last here and it needs a little

17  bit of a flow.

18  BY MR. KOCHERSBERGER:

19  Q.   So, anyway, you were saying, is that peculiar to you or is

20  that a typical thing, that diagnostic process that you use?

21  A.   Definitely true for all the neurologists that I've ever

22  worked with, and I've worked with a lot of other pediatric

23  specialists and they do the same thing, whether they be

24  cardiologists or endocrinologists, or whatever it is.

25  Q.   One of the things that I think came up during

1  Dr. Strickler's testimony was whether or not you reviewed a

2  complete set of records for the particular patient in this

3  case.  Is there anything that you're aware of that exists with

4  respect to this patient that you did not have an opportunity to

5  review to render your opinion?

6  A.   No, sir.

7  Q.   All right.  Let's move into, as Mr. Marshall suggested,

8  your actual opinions in this case, and we'll try to go through

9  them in a systematic process here.

10       But before we do that, can you just sort of summarize,

11  before we get into that detail, sort of the overall Reader's

12  Digest version of what your opinion is in this case?

13  A.   I always get confused.  Is it "C.A." or "A.C.," and I

14  think it's "C.A."  He came to the hospital because of a

15  seizure.  That seizure was caused by a complication of a

16  chronic condition.  And then once that chronic condition -- I'm

17  sorry; once the complication resolved, then "C" lived happily

18  ever after.  And I can elaborate on that as needed, but that's

19  basically my opinion.

20  Q.   Throughout the course of this case, did you review

21  specific medical research literature to help inform your

22  opinions in this case?

23  A.   Well, as I was aware of medical research literature,

24  because that's -- in order to stay current, I think almost

25  every doctor will read the pediatric journals, and in my case

1  the neurology journals, sometimes the neurosurgery and some

2  other journals.

3          MR. KOCHERSBERGER:  All right.  Your Honor, I think

4  to make this go more smoothly, can I give the Government the

5  binder full of the articles that we disclosed, put a binder up

6  on the witness stand, and then if Dr. Scheller wants to refer

7  to one of those, he can identify it and then we'll go through

8  the process of whether or not it should be admitted?

9          THE COURT:  Sure.

10         MR. KOCHERSBERGER:  Just for the Court's information

11  and for my colleague, these in this binder are numbered the way

12  they were in the notice that we provided to the Government.  As

13  we move to admit them, I will mark them as actual exhibits in

14  this case, and then Your Honor can rule on whether or not they

15  should come in as exhibits.  But at this point, it's just the

16  binder full of materials.

17         As Dr. Scheller refers to them, and I don't expect

18  he's going to refer to all of them, but the ones that he does

19  say that were helpful for his opinion, then I'll go through and

20  attempt to admit them as exhibits.  Does that make sense and is

21  that acceptable?

22         THE COURT:  Do you object to that?

23         MR. MARSHALL:  Yes, Your Honor, with the objections

24  that we noted in our motion.  But additionally, this is beyond

25  the scope of rebuttal, again.  This is -- they are now trying

1  to reintroduce Dr. Scheller in a sense almost like a brand new

2  expert, because they're trying to lay the foundation that they

3  couldn't and didn't lay the first time.  They're not rebutting

4  any single point that was mentioned by Dr. Hart or

5  Dr. Strickler.

6       THE COURT:  Yes, what is the -- he reviewed

7  Dr. Strickler's testimony.  This was noticed up for rebuttal.

8  So, when are we going to get there?  In other words, how does

9  this have anything to do with rebutting --

10      MR. KOCHERSBERGER:  I can explain that, Your Honor.

11  The reason we had to bring Dr. Scheller back is because in his

12  original testimony, he addressed just two limited areas of his

13  opinion.  Several other areas of his opinion were attacked by

14  Dr. Strickler and the Government in the other phases of this

15  case with Dr. Hart and Dr. Strickler, we're going to talk about

16  those other opinions outside of the two that we've already

17  talked about, and in order to do that, we need to have

18  Dr. Scheller give the foundation for those other opinions,

19  which are contained within these articles, some of them.  Some

20  of them he probably won't need to use.  But since I don't know

21  exactly what the Government is going to focus in on, these are

22  all of the articles that he identified as being salient to his

23  opinion.

24      THE COURT:  Yes, but how is this rebutting

25  Dr. Strickler's testimony?

1          MR. KOCHERSBERGER:  Dr. Strickler challenged opinions

2     outside of the two that we had presented testimony about at the

3     first hearing.  These are the foundational materials for those

4     other opinions that are contained within his disclosure outside

5     of the two that he actually already testified about.

6          MR. MARSHALL:  And Your Honor, the defense was on

7     notice of all of the information.  In five of the subparagraphs

8     in our notice, we talk about all of Dr. Scheller's opinions.

9     That's also in our introduction, we're talking about all of

10    Dr. Scheller's opinions.  They were on notice of all of them.

11    And it's disingenuous to state that they only talked about two.

12    On direct examination of Dr. Scheller the first time, they went

13    through all his points in his report.  So they talked about all

14    of them.  So we should have had the foundation for all of them

15    at that point.  Trying to backdoor a foundation that wasn't

16    provided in the first direct examination for the Daubert

17    hearing is unfair.  The Court excluded it once before, and

18    we're asking you to exclude it again.

19         MR. KOCHERSBERGER:  And we've already had this

20    argument, Your Honor.

21         THE COURT:  Well, I know, but part of it is, this

22    whole thing seems to be so much more complicated than it needs

23    to be.

24         You know what, I'm going to take a break, I'm going

25    to go look at some of the transcript of the earlier hearing,

1  and then I'm going to make a ruling, and then we're going to

2  try to get through this thing.

3  (Recess was held at 10:43 A.M)

4  (In Open Court at 11:23 A.M.)

5           THE COURT:  All right.  I'm going back to Document

6  92, which was the United States' original Motion in Limine

7  regarding, and it's entitled, Regarding the Admissibility and

8  Scope of Defendant's Proposed Expert Testimony, and the expert

9  the Government said that this motion pertained to is

10 Dr. Scheller.  I'm reading from the very first paragraph.

11          It says:  "The United States requests that as a

12 matter of law, this Court preclude Dr. Scheller from testifying

13 in this matter at any pretrial motion hearings or at trial

14 because he lacks the qualifications to testify regarding the

15 subject matter and because his opinions are not rooted in

16 science and have not and cannot be tested."

17          So as far as -- and for example, in Paragraph 5, the

18 Government then honed down on some of the examples in

19 Dr. Scheller's report.  But defense counsel was on notice as a

20 matter of law that the United States was seeking to preclude

21 Dr. Scheller from testifying at all.  So that's a ruling I made

22 earlier, and I'm sticking by it.

23          Now, after Dr. Scheller's testimony on direct, on

24 November the 30th the Defendant filed, and it's captioned,

25 "Mr. Duran's Amended Exhibit List for Daubert Hearing."  And

1   it's Document 126.  It was filed, I think it was November the

2   30th, 2018, after the first go-round of Dr. Scheller's

3   testimony.

4         The Government then followed up with Document 14 --

5   I'm sorry.  The Government then filed a motion to strike the

6   amended Daubert list.  That was Document 129 filed on

7   December 7, 2018.  And then I entered an order on that, it's

8   Document 146, granting in part and denying in part the

9   Government's motion to strike the amended exhibit list.

10         What I did allow was, there was a reference in the

11   earlier November 19th hearing, and I ruled that the defense

12   could provide the Massachusetts case, Commonwealth vs. Epps,

13   which was referenced in the record, and submit it as

14   Defendant's Exhibit 4.  And then I said at the hearing, if

15   there are other cases from other courts where Dr. Scheller's

16   testimony is the subject of a court opinion, then I was going

17   to allow the defense to submit supplemental case authority.

18   And then I admitted, I think it was Exhibits 11, 13, 16, 26 and

19   27.

20         So we were talking about -- and then I said in that

21   order that I agreed with the United States that there was no

22   evidence presented during the evidentiary portion of that

23   hearing to indicate that Dr. Scheller was aware of or

24   considered the material in the amended exhibit list,

25   Document 129, at Page 3.  And I said because Dr. Scheller was

1  not questioned on direct or on cross-examination about these

2  submissions, that I didn't consider it appropriate -- or I was

3  ruling in favor of the Government on this because there was

4  nothing in the record that at least the medical literature part

5  of the Defendant's amended exhibit list for the Daubert hearing

6  was relied upon by Dr. Scheller in his opinions.

7          Now, I'm going to read -- this is out of Black's Law

8  Dictionary.  "Rebuttal evidence:  Evidence given to explain,

9  repel, counteract, or disprove facts given in evidence by the

10  opposing party."  And so that was the purpose of today's

11  hearing.  I think at the time Dr. Strickler testified,

12  Dr. Scheller was out of the country.  So this was for rebuttal

13  testimony.  And, again, I've read the definition of what

14  rebuttal evidence is.

15          Now, the Government has filed a Motion to Strike

16  Notice of Foundational Material for today's hearing, but at

17  this point, I have no way of going over this list of all of --

18  let's see.  These are articles beginning with, let's see, 1

19  through 32.  I have no way of comparing these 32 proposed

20  articles, whether they're learned treatises or whatever they

21  are, with what was on the original list.  So I think the

22  easiest way for this to proceed is I want to hear what the

23  rebuttal opinion is, and then if some of this was relied upon

24  in support of the rebuttal, then I'll let you make an offer at

25  that point and I'll consider the objection and then rule on it.

1          But I'm not going to all of a sudden admit all of

2   this stuff and then try to sort through and figure out whether

3   it should have been given at the first hearing, because it

4   wasn't offered then, and I'm not going to go back and redo

5   that.

6          So, now, let's have Dr. Scheller resume the stand and

7   let's hear what the rebuttal opinions are, and then if some of

8   the material is relevant and in support of the opinion, then

9   you can offer it.  That's how we're going to proceed.

10          MR. KOCHERSBERGER:  May it please the Court.

11          THE COURT:  You may proceed.

12   BY MR. KOCHERSBERGER:

13   Q.   Dr. Scheller, we're going to talk about some of the

14   opinions that are reflected in your original letter that was

15   Government's Exhibit 3 at the prior hearing, specific ones that

16   Dr. Strickler took issue with in her testimony.

17          MR. KOCHERSBERGER:  May I approach the witness with

18   Exhibit 3, Your Honor?

19          THE COURT:  Sure.  Exhibit 3 is his original opinion;

20   right?

21          MR. KOCHERSBERGER:  That's correct, Your Honor.  And

22   I believe it was Government's Exhibit 3.

23          THE COURT:  All right.

24          MR. KOCHERSBERGER:  Would it be helpful if I cite to

25   Dr. Strickler's testimony for Your Honor, as to how this is

1   rebuttal, or at least give you the page and line number?

2          THE COURT:  Yes, that would be helpful, if you've got

3   it handy.

4          MR. KOCHERSBERGER:  I do.  I won't read the quote

5   from Dr. Strickler, but I'll at least point you to the record

6   where she talked about the thing.  That's probably the easiest

7   way to handle that.

8   BY MR. KOCHERSBERGER:

9   Q.   So, in Dr. Strickler's testimony, looking at your opinion

10  here, you stated:  "Infants who are victims of child abuse are

11  often found to have unexplained bruises, rib and limb

12  fractures, scalp injuries, brain injuries, and neck injuries,"

13  and then you said "C" had none of these.

14          At Page 84, Line 22, among other places, it appeared that

15  Dr. Strickler challenged your testimony by claiming that there

16  was a brain injury.  So, let me ask you, how do you define a

17  brain injury with respect to this portion of your opinion?

18  A.   So in 2019, the best way to document a brain injury is to

19  observe the presence of areas of brain compromise on the MRI

20  test.  The MRI test has a section of the test called the

21  diffusion portion of the test.  For example, if somebody has a

22  stroke, somebody has a brain tumor, somebody has a brain

23  infection, and somebody suffers a serious head injury that

24  causes brain injury, then those areas of the brain that are

25  compromised will show up on the MRI portion of the test.  And

1  in "C's" case, there were none of these areas of brain

2  compromise documented on his MRI test.

3  Q.   And does that differ from the discussion that we've had

4  and will be having with respect to hygromas and hematomas?  And

5  if so, how?

6  A.   Sure.  The brain is the brain, and then there's a space in

7  between the brain and the inside of the skull.  Something can

8  go on in that space and cause a problem, but that doesn't mean

9  that there's something that has injured or compromised the

10  brain.

11  Q.   All right.  And how did you determine that there was no

12  evidence of brain injury?  I think you mentioned it, but just

13  to be clear, what methodology did you employ to make that

14  determination?

15  A.   The methodology that neurologists use which is careful

16  looking, observation, of the diffusion portion of the MRI test.

17          THE COURT:  I didn't hear you.  What portion of the

18  MRI test?

19          THE WITNESS:  It's called diffusion, and it

20  represents a method that the MRI is able to look at areas of

21  the brain that have been compromised.

22  BY MR. KOCHERSBERGER:

23  Q.   Okay.  Are those the same images that you talked about in

24  your initial testimony that demonstrate the hygromas, or is it

25  a different image all together?

1   A.   Well, an MRI is hundreds of images, and the series that

2   demonstrates the hygromas is a different series, but it's all

3   part of the same.   The child was in the scanner for an hour and

4   they did all these techniques to document various problems that

5   one might be able to notice.

6   Q.   Did you have anything different that you relied upon to

7   make this conclusion than Dr. Strickler or Dr. Hart had in

8   their record?

9   A.   No, it was the exact same images.

10  Q.   Next, you indicated that "C's" head CT scan and MR scan

11  were misinterpreted to demonstrate chronic or subacute subdural

12  hematomas (blood clots) when, in fact, the scans revealed

13  chronic subdural hygromas.   Dr. Strickler testified that you

14  were wrong.   Page 94, Line 12 is where that starts.

15      But to try to have this make sense, what is your

16  understanding of how the United States' witnesses interpreted

17  the MR and CT scans with respect to the hematoma/hygroma issue?

18  A.   Sure.   So, again, we're talking about a collection of

19  something that is sitting in between the brain and the inside

20  of the skull, something that doesn't belong there.   May I use

21  an analogy?

22  Q.   Sure.

23  A.   If I see a person in uniform from a distance and I

24  recognize that uniform as a military uniform, I can say, I

25  think that person over there is in the military.   If the person

1  next to me says, well, I know that person is in the Navy, if

2  that person has no better vision than me, then that's taking a

3  generality and making it into something specific.

4       So this is the difference of opinion I have with

5  Drs. Strickler and Hart, is that a subdural hygroma is a

6  general term for a fluid collection that's in a space where it

7  doesn't belong, and that's all you can see when you look at

8  "C's" MRI scan.

9       Drs. Strickler and Hart are saying, no, that's something

10 specific.  It's not just a fluid collection, it was a fluid

11 collection that was once an acute blood clot and has now

12 evolved or degenerated into a chronic blood clot.  So they're

13 giving it a specific label, and I'm giving it a general label

14 because I don't believe you can make a specific call from what

15 that looks like.

16 Q.   All right.  And what was the -- it's sort of baked into

17 what you already said, but just to be very poignant about it,

18 what methodology did you use to reach your conclusion about the

19 identity of what you saw on those images?

20 A.   So first and foremost, experience with looking at MRI

21 scans, and then awareness of the literature that there is,

22 indeed, something called a chronic subdural hematoma, and that

23 there is, indeed, something called a chronic subdural hygroma,

24 which is a less specific term and one that is widely used.

25 Q.   Are there any specific articles that you recall reviewing

1   in relation to this particular subject matter?

2   A.   Sure, there's a number of them.  There's a number of

3   articles by a Dr. Lee written in the '90s, early 2000s, and

4   then the last one was around 2014.  And his first initials are

5   K.S. Lee.

6        There is an article by Dr. Cho, C-h-o, that I referred to,

7   and there is --

8   Q.   Let me stop you there.  You said Dr. Cho; right?

9   A.   Yes.  I think that was in and around 2005.

10            MR. KOCHERSBERGER:  All right.  This is in the list

11   that we provided at No. 22.  I'm going to mark it for

12   identification here as -- let me get my exhibit stickers.

13            THE COURT:  Is 22 on the exhibit list?

14            MR. KOCHERSBERGER:  It's No. 22 on the list of

15   foundational materials.  I'm going to give it an exhibit number

16   now.

17            THE COURT:  I meant to say foundational materials.

18            MR. KOCHERSBERGER:  And my understanding is that the

19   defense -- unfortunately, we both used numbers, but the defense

20   is up to No. 29.  So I'm going to mark it as that.

21            Can I give the witness one of these binders, and then

22   we'll use the one that comes out of binder as the actual --

23            THE COURT:  Yes, that makes sense.

24            THE WITNESS:  There's one by my seat if you're

25   running low.

1    MR. KOCHERSBERGER:  No, I've got one, and you've got

2  one.

3  BY MR. KOCHERSBERGER:

4  Q.   I've handed you what's now been marked as Defense

5  Exhibit 29, which corresponds with the article that was No. 22

6  on the Notice of Foundational Materials.  Is that the Dr. Cho

7  article that you were just referring to?

8  A.   Yes, sir.

9  Q.   And what type of a publication --

10    THE COURT:  Just a second.  So it's Exhibit 29?

11    MR. KOCHERSBERGER:  It's Defense Exhibit 29.

12  Unfortunately, the Government ended up on Government's

13  Exhibit 29, so their next number is 30.  We should have used

14  letters, and I apologize.  We didn't do that.

15  BY MR. KOCHERSBERGER:

16  Q.   As I was saying, what type of a publication is this

17  article from?

18  A.   It's from a Korean neurosurgical journal that's written in

19  English.

20  Q.   Is that a peer-reviewed -- are you familiar with the

21  journal, by the way?

22  A.   Sure.

23  Q.   Is that a peer-reviewed journal?

24  A.   Yes, sir.

25  Q.   Is it the type of thing that people in your profession

1  normally rely upon for medical literature of this sort?

2  A.   Neurologists, yes.

3       MR. KOCHERSBERGER:  And so at this time, Your Honor,

4  I'd move to admit Defense Exhibit 29.

5       THE COURT:  Which is the article out of the Korean --

6  I'm sorry, what was the name of it?

7       THE WITNESS:  Journal of Korean Neurosurgery.

8       MR. KOCHERSBERGER:  And to help Your Honor so that

9  you have the full name, it's the one that was identified as

10  No. 22 on that list that we provided earlier.

11       THE COURT:  Okay.  Now, does the Government wish to

12  state an objection?

13       MR. MARSHALL:  Yes, Your Honor.  At this point, I

14  don't think a foundation has been laid about how it supports

15  his finding and how it refutes anything that was in rebuttal.

16  He stated that this is a journal article.  He hasn't mentioned

17  in any way how he's relied on it and how it was useful in the

18  formation of his beliefs.

19       THE COURT:  Lay a little more foundation.

20       MR. KOCHERSBERGER:  Sure, Your Honor.

21  BY MR. KOCHERSBERGER:

22  Q.   So, what's the significance of this article with respect

23  to your opinion?

24  A.   This article, like the other ones I quoted, documents and

25  demonstrates that there is such a thing called a chronic

1  subdural hematoma, which is, again, just an old blood clot, and

2  there's something called a chronic subdural hygroma, which is

3  an old collection of fluid, and that there is confusion between

4  the two, and that they are two separate things.

5  Q.   And is this article, or the subject of this article,

6  something that you reviewed in order to help inform your

7  opinions in this case?

8  A.   Well, it's something that I was aware of.  Again, because

9  I deal with fluid collections in the brain as a part of my

10 practice, I'm aware of the literature.  But I supplied this

11 article in order to support that awareness that I have.

12            MR. KOCHERSBERGER:  Okay, now we move to admit the

13 exhibit, Your Honor.

14            MR. MARSHALL:  I don't see how that title has

15 anything related to what the defense has even mentioned.

16 Furthermore, I have been scanning the article, and he keeps

17 referring to the term chronic subdural hygroma.  I don't see

18 the term chronic.  And if we're dealing with definitions, these

19 special medical definitions and trying to say that there's some

20 sort of difference, I think the chronicity issue is important.

21 And this article does not support his chronic subdural hygroma

22 findings.

23            THE COURT:  You're going to ask him that on

24 cross-examination; right?

25            MR. MARSHALL:  Yes, sir.

1     THE COURT:  So doesn't the objection at this point go

2  to weight?  In other words, I'll admit it for purposes of this

3  hearing.  The Government's objection, in my view, goes to

4  weight.

5     (Defense Exhibit No. 29 admitted.)

6     MR. KOCHERSBERGER:  Thank you, Your Honor.

7  BY MR. KOCHERSBERGER:

8  Q.   I believe you also mentioned -- did you say Dr. Lee was

9  another one?

10  A.   Yes.  K.S. Lee.  And there are several articles written by

11  that gentleman.  I could do the most relevant one, to save

12  time.  I'll leave that up to the Court.  Or we can go

13  through -- I think there are three or four articles in this

14  binder from that author.

15  Q.   Let me find them and show them to you here.  So, if you

16  look at the document that was identified in the Notice of

17  Foundational Materials as Document 16, I'm going to mark that

18  as Defendant's Exhibit 30 for the purposes of this hearing.  If

19  you could, just pull that out of the book so I can put the

20  exhibit sticker on that, Dr. Scheller.

21     MR. KOCHERSBERGER:  May I approach, Your Honor?

22     THE COURT:  You may.

23  A.   Yes, I'm looking at it.

24  BY MR. KOCHERSBERGER:

25  Q.   Can you pull it out of the book?

1    A.   Oh, sure.

2    Q.   Is this one of the K.S. Lee articles that you were just

3    discussing?

4    A.   Yes, sir.

5    Q.   All right.

6             MR. MARSHALL:   I'm sorry; I got confused on the

7    numbers.   This is Exhibit 30, but what was the number --

8             MR. KOCHERSBERGER:   16.

9             THE COURT:   16 in the binder.

10            MR. MARSHALL:   Thank you.

11   BY MR. KOCHERSBERGER:

12   Q.   And with respect to your opinions in this case, what is

13   the significance of this particular publication for your

14   testimony?

15   A.   This specific one, or the series?  Because they really are

16   a series that describes Dr. Lee's experience and research into

17   understanding the difference between a chronic subdural

18   hematoma and a chronic subdural hygroma.  So that includes this

19   article, which is Exhibit 30, Defense Exhibit 30, published in

20   a journal called Brain Injury in 1998.  But it also includes --

21   Q.   We'll get to the other, but we have to do this sort of

22   systematically for the record.  You said there's a series of

23   articles, of which this is one.  It's contained in the Brain

24   Injury journal; is that correct?

25   A.   Yes, sir.

1  Q.   Is that a peer-reviewed journal?

2  A.   Yes, sir.

3  Q.   Is it a journal of the type that you review in your

4  profession as a pediatric neurologist?

5  A.   Yes, sir.

6  Q.   Is it considered a learned treatise for those purposes?

7  A.   Yes, sir.

8          MR. KOCHERSBERGER:  I move to admit Exhibit 30.

9          MR. MARSHALL:  No additional objections other than

10  what's already been made.  And just for the record, we're not

11  going to be objecting to the quality of the journals, so I

12  don't know if that will save some time.  The objection is how

13  it relates foundationally to Dr. Scheller.

14          THE COURT:  Okay.  I'll note the objection, and I'll

15  admit it for purposes of this hearing, Exhibit 30.

16      (Defense Exhibit No. 30 admitted.)

17  BY MR. KOCHERSBERGER:

18  Q.   I'm going to ask you to pull out what's No. 18 in the book

19  in front of you, so that I can identify it as Defense

20  Exhibit 31.

21          THE COURT:  Are these the Lee articles?

22          MR. KOCHERSBERGER:  Yes, Your Honor.

23          THE COURT:  Do you want to do them as a group, the

24  rest of them?

25          MR. KOCHERSBERGER:  I can, if that's easier, sure.

1          THE COURT:   I mean, separate exhibits, but offer them

2   at the same time.

3          MR. KOCHERSBERGER:   Okay.  So that one is No. 18, and

4   then I believe the next one is No. 19.

5   BY MR. KOCHERSBERGER:

6   Q.   Is that correct, Dr. Scheller?

7   A.   Yes, sir.

8   Q.   Those are both Lee articles in the series you were just

9   describing?

10  A.   Yes.  And then there's a fourth one, as well.

11  Q.   So we will mark what was originally 18 in the Notice of

12  Foundational Materials, as Defense Exhibit 31.

13         MR. KOCHERSBERGER:   May I approach?

14         THE COURT:   Yes.  Feel free to go back and forth as

15  necessary.

16  BY MR. KOCHERSBERGER:

17  Q.   And if you could remove No. 19 from the book in front of

18  you, we'll mark that as Defense Exhibit 32.

19       All right.  So with respect to Defense Exhibits 30, 31 and

20  32, does that include all of the documents in the series of Lee

21  articles that you just described?

22  A.   One more, sir.  And that's in the notebook labeled 20.

23  Q.   20?  Okay.  Can you pull that out?  We'll mark that one as

24  Defense Exhibit 33.

25         MR. KOCHERSBERGER:   And to be clear, now that we have

1  all of these, we'll move to admit all of the series that we

2  just discussed, which are Defense Exhibits 30 through 33.

3          THE COURT:  Same objection?

4          MR. MARSHALL:  Yes, Your Honor.

5          THE COURT:  I'll note the Government's objection for

6  the record, but they'll be admitted for purposes of this

7  hearing, for the same reason as I admitted Exhibit 30.  And for

8  the record, then, Exhibits 30, 31, 32, 33, and was it 34?

9  What's the last one?

10          MR. KOCHERSBERGER:  Just through 33, Your Honor.

11          THE COURT:  33.  Those four exhibits are the series

12  of articles authored by Dr. K.S. Lee?

13          MR. KOCHERSBERGER:  Correct, Your Honor.

14      (Defense Exhibits No. 31, 32 and 33 admitted.)

15  BY MR. KOCHERSBERGER:

16  Q.   Dr. Scheller, the purpose of the series of articles, now

17  that we have them, and how that influenced your opinion in this

18  case, is what?

19  A.   Dr. Lee documents very clearly in that series how subdural

20  hygromas develop, how they become chronic, how they sometimes

21  turn into acute subdural hematomas, and if they do, then over

22  time they will also turn into chronic subdural hematomas.  And

23  so all three are valid possibilities, and sometimes they exist

24  without one another and sometimes they all exist together.

25  Q.   All right.  The next portion of your opinion -- again, you

1   can follow along with Government's Exhibit 3 -- indicates:

2   "Pediatric neurologists and neurosurgeons encounter these often

3   in practice when infants are referred for larger than expected

4   head circumferences.  Some develop as a result of birth, others

5   for no known reason."  Dr. Strickler had some concerns about

6   that opinion, and that's located at Page 95, Line 19, of her

7   transcript.

8        First, when you say that pediatric neurologists and

9   neurosurgeons encounter these, what is the "these" that you're

10  talking about in your opinion here?

11  A.   Fluid collections between the brain and the inside of the

12  skull, and specifically subdural hygromas.

13  Q.   And what is the basis for your understanding of these

14  experiences that pediatric neurologists and neurosurgeons have?

15  A.   Well, my own experience, and then I'd refer you to an

16  article which is No. 28 in the packet, and it's written also by

17  a Dr. Lee, published in 2018.

18  Q.   All right, let me mark that as Defense Exhibit 34.  How

19  does Defense Exhibit 34 pertain to your opinion with regard to

20  hygromas encountered in the practice of neurosurgeons and

21  neurologists?

22  A.   Well, this is a practice of neurosurgeons, and they

23  describe their experience at their hospital of diagnosing and

24  treating patients with this exact condition.

25  Q.   Was there another that you were indicating that relates to

1  this part of your opinion?

2  A.   Yes, sir.   A similar experience was had by a

3  Dr. Hellbusch, H-e-l-l-b-u-s-c-h, and that is File No. 30 in

4  the packet.   And again, Dr. Hellbusch is a neurosurgeon, so he

5  describes his practice.

6  Q.   We'll mark what was previously noticed as Article 30 as

7  Defense Exhibit 35.

8       It looks like you took this Hellbusch article from Tab 31,

9  right, not 30, just to be clear?

10 A.   Could be.   That's right.

11 Q.   Nonetheless, it's Defense Exhibit 35, and the import of

12 Dr. Hellbusch's article, with respect to your opinions related

13 to the experience of neurosurgeons and neurologists, is what?

14 A.   Identical to what I learned from the Dr. Lee article of

15 2018, which was the previous exhibit.   Not K.S. Lee, but the

16 other Lee.

17 Q.   As I under- -- were there any others?

18 A.   There's just one other, and that is, I believe -- and I

19 was going to say No. 30, but now I'm not sure.   It's an article

20 Dr. Wiig, W-i-i-g, and that is an epidemiologic or

21 population-based study of children with large heads in Norway.

22 Q.   All right.   Then we'll mark that article by Dr. Wiig that

23 was identified in the Notice as No. 30 as Defense Exhibit 36.

24          MR. KOCHERSBERGER:   We move to admit those three

25 articles, 34, 35 and 36, at this time, subject to their

1   objections.

2          MR. MARSHALL:  And again, Your Honor, the objection

3   to this one is foundation.  These are all related to

4   hydrocephalus or BESS.  Dr. Scheller says that "C.A." does not

5   have this condition, so their relevance on this proceeding

6   seems moot.

7          Dr. Plunkett had initially proposed the possibility

8   of the child having BESS, but the doctors from the prosecution

9   side, as well as Dr. Scheller, seem to be in concurrence that

10  this is not a condition that "C" had.  So the relevance of

11  these articles it seems is meaningless in this case.

12         THE COURT:  I'm sorry, what's the condition?

13         MR. MARSHALL:  Hydrocephalus, or BESS.  In

14  Dr. Scheller's first testimony -- and that stands I think for

15  benign extra either subdural or subaxial space.  In

16  Dr. Scheller's first time here, about a year ago, he said that

17  "C" did not have that condition.

18         THE COURT:  How is it relevant, then, if everyone is

19  in agreement?

20         MR. KOCHERSBERGER:  I don't know if everyone is in

21  agreement, so I guess we'll ask Dr. Scheller.

22  BY MR. KOCHERSBERGER:

23  Q.   Is that an accurate representation of your opinion with

24  respect to this case?

25  A.   The other attorney did quote me correctly, that I did not

1   believe that "C" -- I don't believe that "C" had the excess

2   fluid condition between the brain and the first membrane.   May

3   I explain just to make it clear?

4   Q.    Yes.

5   A.    Fluid can accumulate in all kinds of wrong places and

6   cause a child's head to get too big.   One of the places it can

7   accumulate is immediately outside the brain underneath the

8   first layer of covering, the first layer I call the ceiling of

9   the brain.   So in between the brain and the ceiling, a fluid

10  accumulation would be called BESS, as the other attorney

11  suggested, and "C" did not have that.

12        Another type of fluid accumulation is in between the

13  ceiling and the roof, which I would use as an analogy to the

14  place under the dura, subdural, which I'm talking about the

15  subdural hygroma, and when that happens, fluid accumulates as

16  well.   It's just in a different compartment.   And that's what

17  I've been suggesting that "C" has.

18        The term that the other attorney used, I'd say very

19  reminiscent of Dr. Strickler and Dr. Hart, is that he used a

20  general term and then a specific term.   Just like I gave the

21  analogy with the uniform, hydrocephalus just means too much

22  fluid.   Too much fluid could be between the roof and the

23  ceiling, or too much fluid could be between the brain and the

24  ceiling.

25        So I don't want there to be any confusion.   Hydrocephalus

1  is just a general term.  BESS, as the other attorney said, is a

2  very specific term, and I will say, and did say, that "C" did

3  not have BESS according to what I saw in the records.

4  Q.    And these particular articles that were identified as

5  Defense Exhibits 34, 35 and 36, I believe, are those restricted

6  to BESS or the more general term that you were just talking

7  about, the hydrocephalous?

8  A.    Some talk about hydrocephalous in a general term, and some

9  talk about both hydrocephalus from too much fluid between the

10 roof and the ceiling, or too much fluid under the ceiling.

11        MR. KOCHERSBERGER:  With that explanation, then, we

12 renew the motion to admit.

13        THE COURT:  Well, the relevance is very limited,

14 because I guess everyone is in agreement that that condition

15 that's referred to as BESS is not applicable in this case.

16 It's got a limited relevance, but all admit it for purposes of

17 this hearing.

18      (Defense Exhibits No. 34, 35 and 36 admitted.)

19        MR. KOCHERSBERGER:  I'll just ask one follow-up

20 question for Dr. Scheller.  Hopefully I'm understanding

21 correctly.

22 BY MR. KOCHERSBERGER:

23 Q.    Dr. Scheller, you're saying that "C" did not have BESS,

24 but that he did have a different type of hydrocephalus that's

25 reflected in these articles; is that correct?

1    A.    Yes, sir.

2    Q.    Okay.  Next in your opinion you say that most are not

3    related to accidental or abusive trauma.  Dr. Strickler

4    disputed this.  It starts at Page 99, Line 20 of the

5    transcript.

6         First, when you say most, most what are you talking about

7    in your opinion?

8    A.    Most chronic subdural hygromas.

9    Q.    So most chronic subdural hygromas are not related to

10   accidental or abusive trauma; is that correct?

11   A.    Yes.  And I am talking about young children.  It would be

12   a whole other story if we were talking about senior citizens or

13   another group.

14   Q.    All right.  Are there any research articles related to

15   this that you relied upon, or that you're familiar with, about

16   the cause of most chronic subdural hygromas?

17   A.    Yes, sir.

18   Q.    All right.  And are those articles we've already talked

19   about?  If so, which exhibit?  And if not, which ones?

20   A.    Yes.  That would be included in the Hellbusch article.  It

21   would be included in the Cho and the Park -- I'm sorry, I

22   didn't say Park -- in the Cho and the Lee, not K.S., articles.

23   And it would be within the K.S. Lee articles, as well.

24   Q.    And those are all articles that have already been

25   admitted?

1   A.    Yes, sir.

2   Q.    Then your opinion goes on to talk about:  "Subdural

3   hygromas of infancy are usually benign, but they can

4   occasionally cause small brain surface hemorrhages.  These

5   occur for two reasons.  Small vessels that course from the

6   inner skull to the brain surface are stretched by the fluid

7   accumulation and can tear and leak blood.  The body attempts to

8   wall off the fluid collection and builds a membrane.  This

9   membrane is vascular and can leak blood.  A small surface

10  hemorrhage is apparent on C's head CT and MR scans."

11       I believe you testified about all of this at your earlier

12  portion of the testimony, but just to be clear, with respect to

13  this part of your opinion, how did you arrive at that

14  conclusion?

15  A.    Again, experience, but also in the articles by Park, by

16  both Lees, and in the articles by somebody that I haven't

17  quoted before, and this is a hard name to pronounce,

18  Wittschieber.  And I'm going to tell you which one that is.

19  It's 29, I believe, or at least I had it as 29.

20  Dr. Wittschieber describes that mechanism, and then finally,

21  there is --

22  Q.    Hang on one second.  With respect to Dr. Wittschieber,

23  that was identified as Article No. 29 on the list.  I don't

24  believe we have admitted that as an exhibit yet; right?

25  Dr. Scheller, it's not in your --

1  A.   We have not.

2  Q.   It's still in your book?

3  A.   Yes, sir.

4  Q.   Okay.  So let's call that Defense Exhibit 37, the

5  Wittschieber article.

6          MR. MARSHALL:  Which number was that?

7          MR. KOCHERSBERGER:  It was No. 29 in the list of

8  foundational materials.

9  BY MR. KOCHERSBERGER:

10 Q.   And did you say there was another?

11 A.   I thought there was, but I might be wrong.  One moment.

12 I'll quote the Park article, which is from 2008, and that is

13 Section No. 24 in the notebook.

14 Q.   So the Park article, which was identified in the Notice as

15 No. 24, will be marked as Defense Exhibit 38.

16          MR. MARSHALL:  Your Honor, I have a question for

17 defense counsel.  I don't understand how this Wittschieber

18 article is different than the Government's Exhibit 26, also

19 being a Wittschieber article.

20          THE COURT:  Is it the same article?

21          MR. MARSHALL:  It appears to be the same article.

22 The typeface -- it could be a copy.  They seem similar.  Some

23 of the formatting looks a little bit different, but overall,

24 they look -- they're both from the American Journal of

25 Neuroradiology.

1      MR. KOCHERSBERGER:  They're likely the same article,

2  Your Honor, and we just have a more inclusive list here.  I

3  just don't have the -- I think I do.  Hang on.

4      I am mistaken, I don't.  So I'm going to keep it

5  marked as Defense Exhibit 37.  Is that what I said?  You have

6  it right there in front of you.

7      THE WITNESS:  37.

8      MR. KOCHERSBERGER:  And apparently that's identical

9  to Government's Exhibit 26.

10     THE COURT:  Well, let's do this.  I'll note for the

11  record that it appears that Government's Exhibit 26 and

12  Defendant's Exhibit 37 appear to be the same article written by

13  the same doctor.  Is it Wittschieber?

14     MR. KOCHERSBERGER:  Wittschieber.

15  W-i-t-t-s-c-h-i-e-b-e-r, I believe.

16  BY MR. KOCHERSBERGER:

17  Q.  All right.  And then you mentioned the Park article, which

18  was at Tab 24; is that correct?

19  A.  Yes.

20  Q.  We'll mark that as Defense Exhibit 38.

21     All right, with respect to those three articles, what is

22  the importance of those with respect to your opinion on the

23  mechanism of subdural hygroma that we just discussed from your

24  opinion?

25  A.  They all describe this two-pronged mechanism in which

1  subdural hygromas can cause some minor hemorrhage and trigger

2  seizures.

3          THE COURT:  What's he rebutting?

4          MR. KOCHERSBERGER:  I'm sorry?

5          THE COURT:  What's it rebutting regarding

6  Dr. Strickler's testimony?

7          MR. KOCHERSBERGER:  I believe that followed from

8  Page 99, Line 20, on through.

9          THE COURT:  All right.

10          MR. MARSHALL:  And Your Honor, I would disagree with

11  that assessment.  I think these are all -- all these documents

12  are trauma-related documents.  Dr. Scheller's claiming that

13  these are all benign conditions, but the articles, themselves,

14  are talking about the hygroma formation post trauma.  They

15  don't support what the doctor is saying, and so I think it does

16  not go to the foundation.

17          These are supposed to be a foundational support, and

18  it just doesn't exist.  And he hasn't done anything to say it

19  supports it other than make a bold two-sentence claim that it

20  supports his claim for seizures, but he hasn't pointed to

21  anywhere in the documents about how it would do so.

22          MR. KOCHERSBERGER:  He was talking about the

23  mechanism of causing small surface bleeds, not seizures yet.

24  We haven't gotten to that, I don't think.

25          THE WITNESS:  I did mention seizures, but I can wait.

1          MR. KOCHERSBERGER:  Nonetheless, that sounds like

2    good fodder for Mr. Marshall on cross-examination to ask

3    Dr. Scheller how it is that -- or I could just do it.

4          MR. MARSHALL:  Your Honor, the objection is just that

5    it's foundational to his opinion.  If he's just giving us

6    articles that aren't truly foundational, if they don't actually

7    support his opinion, if he just makes that claim, we're here in

8    rebuttal and we don't have a chance to have another doctor come

9    in and --

10         THE COURT:  I know, and that's why at this point,

11   it's not clear to me what the basis for rebuttal is.  You asked

12   him about his opinions in Exhibit 3, but you didn't link it up

13   with what Dr. Strickler testified to.  So at this point, I'm

14   going to sustain the objection unless you can lay a foundation

15   as to how the exhibits -- I mean, I'll note that we've

16   already -- it appears that the one exhibit has already been

17   admitted as a Government's exhibit, but it's not clear to me

18   what, in terms of Dr. Strickler's opinion, it's rebutting.  So

19   go back and link that up for me.

20         MR. KOCHERSBERGER:  So in Dr. Strickler's testimony,

21   and I believe it starts at Page 99, Line 20, and going forward

22   through the next several pages, her opinion was that these

23   subdural hygromas do not cause those bleeds in the way that

24   Dr. Scheller had suggested.  Rather, that those bleeds are

25   caused by the trauma, itself.  And that's what he is making the

1  distinction about.

2          THE COURT:  All right.  Let me get to Page 99.

3          MR. KOCHERSBERGER:  Let me get the transcript as

4  well, Your Honor.  And I'm sorry, Your Honor, that was for the

5  previous section that we were talking about.  This particular

6  section is contained starting at Page 25.  Actually, before

7  that, where Dr. Strickler is talking about there being no other

8  cause of these injuries other than traumatic, and she discusses

9  that throughout that section.  I can read some of it, if you

10  prefer.

11          THE COURT:  Yes, that would help.

12          MR. KOCHERSBERGER:  So she says --

13          THE COURT:  Again, are you at Page 25?

14          MR. KOCHERSBERGER:  This is -- I apologize, no.  Hang

15  on.  The page numbers don't show up here at the same time.

16  Page 11 is what I'm reading from here.

17          THE COURT:  All right.

18          MR. KOCHERSBERGER:  Dr. Strickler says:  "Ideally, I

19  would love to find another cause" for the finding.  And so she

20  examines those other causes, and then she ultimately concludes

21  that there was not another cause.

22          Then she says at Page 24, Line 24, through Page 25,

23  Line 2, she talks about whether she was able to locate any of

24  the nontraumatic issues.  She's talking about metabolic issues

25  at this particular point.  And then she rules out any medical

1  conditions that could cause the findings.  That is located at

2  Page 28, I believe.

3          On 28, she's talking about the medical history, and

4  she says she tries to examine whether or not there is some

5  medical condition that may cause the findings.  And then I know

6  she ultimately concludes that there was no other finding, I

7  just have to find that part for Your Honor.

8          THE COURT:  Would it be on Page 31, Line 12?  Or

9  maybe the top of Page 31.

10          MR. KOCHERSBERGER:  Right.  I mean, she discusses

11  this throughout this section, all of the various other things

12  that it could be other than trauma, and she rules out anything.

13          THE COURT:  Right.  And then she says:  "My

14  diagnosis" -- I'm at Line 12, Page 31.  "My diagnosis was that

15  "C" experienced physical abuse, which included his skin

16  injuries and also abusive head trauma."  So that's her.  So

17  what is he rebutting at this point with these articles?

18          MR. KOCHERSBERGER:  Right.  Dr. Scheller is saying

19  that a preexisting hygroma can cause a hematoma by a couple of

20  different mechanisms which are reflected in his opinion, and

21  also in these articles.

22  BY MR. KOCHERSBERGER:

23  Q.  Is that accurate, Dr. Scheller?

24  A.  Yes, sir.

25          MR. KOCHERSBERGER:  So it's rebutting Dr. Strickler's

1  testimony that there was no other possible cause, because she

2  said it didn't work that way, essentially.

3      THE COURT:  Okay.  Now, Mr. Marshall, the objection.

4      MR. MARSHALL:  These articles, I don't believe,

5  support what he's saying.  He makes the claim that this article

6  supports what he's finding, but there's been no identification

7  of where in this article it supports his claim.  And if you

8  look at some of these titles, most of them appear to deal with

9  adults, and some of these are adults in old age.  And as

10 Dr. Scheller has previously testified, that is not the

11 population we are to be considering, because in old age you

12 have brain degeneration that takes place and that can cause

13 some of these hygromas and other things.

14      So these articles aren't supporting the claim he's

15 making when we should be talking about someone that is a child,

16 at least under the age of five, under the age of three.  These

17 don't support the claim that he is making.

18      THE COURT:  And we're talking about exhibits -- what

19 are the numbers, again?

20      MR. MARSHALL:  The Park article was, I believe --

21 I've lost my numbering, Your Honor.  I'm sorry.

22      THE WITNESS:  They're in order.

23      MR. MARSHALL:  Park, I believe, talked about it, and

24 the Wittschieber -- no, not that one.  Some of the Lee articles

25 are dealing with the elderly, as well, and not minors.

1           MR. KOCHERSBERGER:  I believe, and I'm going to hand

2   these back to Dr. Scheller to be sure, but I believe we're

3   talking right now about Defense Exhibits 37 and 38, which are

4   the Wittschieber article and the Park article.

5           THE COURT:  Well, I won't definitively -- I'm having

6   trouble seeing this.  If the articles, as Mr. Marshall

7   indicated, are talking about population groups other than

8   children, I'm not sure they would be relevant.  So I'll reserve

9   on that.

10          MR. KOCHERSBERGER:  And I can ask, just to save the

11  time, which I know seems like a disingenuous thing to say after

12  I'm taking up so much of your time.

13  BY MR. KOCHERSBERGER:

14  Q.   Dr. Scheller, can you describe what those two articles are

15  about and how they actually have something to do with what

16  we're talking about here in regards to the mechanism for

17  causing small brain surface hemorrhages?

18  A.   Sure.  The Wittschieber article obviously just deals with

19  infants, because that's the whole topic of the article, and

20  that article does point out these two mechanisms for chronic

21  subdural hygromas to trigger small amounts of acute hemorrhage.

22          And number two, the Park article, which is the only

23  article that discusses adults only that I provided, that

24  article talks about the same idea.  In other words, when the

25  brain is removed from the inside of the skull, there's a space

1   there, and two things are going on.  Small blood vessels

2   crossing that space are stretched, number one, and number two,

3   membranes are being made to block off an accumulation of more

4   space.  Those two things can leak blood.

5       So the Park article says the exact same idea as it applies

6   to adults and older people.  The Wittschieber article is, of

7   course, just about infants.

8           MR. MARSHALL:  Your Honor, I would beg to disagree

9   with Dr. Scheller.  The Wittschieber article explicitly states:

10  "The term chronic hygromas should be principally avoided as it

11  is a very imprecise and pathogenetically insufficient

12  description."  It is not a term that he uses in the article.

13  He never refers to the term chronic subdural hygroma.  That is

14  the defense argument, and he says it's not a term you should

15  ever use.

16          That is not something that it's talking about, like

17  the way that a hygroma would develop and cause potentially a

18  subdural hematoma.  He never refers to the term in the article

19  because it's an imprecise term that shouldn't be used, and

20  that's the term that Dr. Scheller is using.  It doesn't go to

21  support him in any way.

22          MR. KOCHERSBERGER:  I think we're talking about two

23  different things here.  We're talking about the mechanism by

24  which the small brain surface bleedings can occur.  That's one

25  part of Dr. Scheller's opinion.  We discussed his opinion with

1  respect to the term hygroma and how he's using it, and he

2  identified the articles that were relevant to that.  The fact

3  that this particular doctor doesn't like that term, who wrote

4  the article, doesn't take away from the fact that he describes

5  the mechanism using other terms.

6  BY MR. KOCHERSBERGER:

7  Q.  I guess, why don't you pinpoint in the article -- can you

8  pinpoint in the Wittschieber article --

9           THE COURT:  Let me ask you this:  The Wittschieber

10 article, is that the same article that's -- is this a different

11 Wittschieber article, or is this the same one that's

12 Government's Exhibit 26?

13          MR. KOCHERSBERGER:  It should be the same one, Your

14 Honor.

15          THE COURT:  In other words, it's already admitted.

16 Now, he may not have a valid basis for relying on it, but in

17 other words, if the Government has already admitted that

18 exhibit, then why are we -- what you're saying is, he shouldn't

19 be relying on it, but the exhibit has already been admitted;

20 right?

21          MR. MARSHALL:  That is correct, it has already been

22 admitted.  But it doesn't go to the foundation for his

23 argument.

24          THE COURT:  Right.  So at this point, the article is

25 already in, so then it's an issue about whether or not his

1  reliance on the article is justified, as I see it.

2      (Defense Exhibit No. 37 admitted.)

3          THE COURT:  And the Park article, I don't see the

4  relevance.  So I'll sustain the objection as to Exhibit 38.

5  Let's keep moving.

6          MR. KOCHERSBERGER:  The Park article, Your Honor?

7          THE COURT:  Yes.  You said it's for seniors, it's for

8  adults.  It pertains to adult brains.

9          MR. MARSHALL:  Yes, Your Honor.  I may have said

10 seniors, but the age range that it actually lists is 37 to 83.

11 Clearly adults to senior citizens.

12         THE COURT:  Right.  So on that basis, I'm sustaining

13 the objection.

14         MR. KOCHERSBERGER:  Okay, I understand, Your Honor.

15 What I would expect would happen is in the closing arguments,

16 we can make these arguments about whether these articles

17 actually support these things and to what extent, and we can

18 point you to language in a way that's much more efficient.

19         THE COURT:  Well, it's of record, and I suppose if I,

20 in reviewing the closing arguments, if I feel like I made an

21 error, then I'll just note that I'm changing as to that

22 article.

23         MR. KOCHERSBERGER:  Okay.

24 BY MR. KOCHERSBERGER:

25 Q.  All right.  Now let's talk about what your opinion

1   proceeds into.  "when the brain surface is irritated with

2   blood, it can trigger a seizure."  And I don't think there was

3   really much in the way of dispute about whether that's true.

4   But following that, you say:  "This is why "C" had an episode

5   of altered mental status and irregular breathing on the morning

6   of 9/28."

7       So first, what is why he had that episode of altered

8   mental status and irregular breathing?

9   A.   He had a seizure at that time.

10  Q.   And I believe the Court actually, at Page 120, Line 18,

11  and continuing onto Page 121, Page 4, expressed concern about

12  whether you can make that diagnosis based on the record here.

13  So, what methodology did you use to determine that it was a

14  seizure that caused the altered mental status and irregular

15  breathing on the morning of 9/28?

16  A.   The specialty of neurology is the one that is called

17  around the world, and particularly in the U.S., when anybody is

18  having a seizure, whether they be an infant or old person or

19  anybody in between.  One of the major topics that all

20  neurologists are tested on when we take our board exam is the

21  diagnosis and treatment of seizures, and so that's something

22  that's key in a neurologist's training and experience.

23  Certainly I've diagnosed and treated thousands of infants,

24  children and teenagers who have had seizures in my 30 years of

25  practice.

**1**      So the best explanation for an infant who has an altered

**2** mental status and alterations in the automatic control of what

**3** we do usually without thinking, like breathing, the best

**4** explanation is a seizure, absent any other seizure triggers.

**5** He didn't ingest any medicine he shouldn't have, he didn't have

**6** any signs of a brain infection, so on and so forth.  So clearly

**7** to a neurologist what "C" experienced that day was a seizure.

**8**           THE COURT:  Are you going off of something that I

**9** said, or are you going off of something that Dr. Strickler

**10** said?

**11**           MR. KOCHERSBERGER:  It was something that you asked

**12** Dr. Strickler about and she commented on as a result of your

**13** question at those two lines I suggested.  Dr. Strickler said

**14** that it was outrageous for Dr. Scheller to be rendering such an

**15** opinion having essentially not seen the child, I guess, is what

**16** her concern was.

**17**           THE COURT:  In other words, Dr. Strickler, and again,

**18** I haven't -- I'm trying to find it here on this transcript.

**19**           MR. KOCHERSBERGER:  I hope I wrote it down correctly.

**20** 120, Line 18, and 121, Line 4.

**21**           THE COURT:  Right, that's what I said.  But was I

**22** asking the witness a question?

**23**           MR. KOCHERSBERGER:  You were, I believe.  I believe

**24** her response is there, as well.

**25**           THE COURT:  All right.  "So in order to ascribe a

1  seizure to blood being on the surface of the brain, you first

2  have to figure out why is the blood there in the first place,

3  and how could that factor into the child having a seizure."

4          MR. KOCHERSBERGER:  And --

5          THE COURT:  Okay, these are questions that I think I

6  asked, and this was Dr. Strickler's testimony.  So, what's he

7  rebutting?

8          MR. KOCHERSBERGER:  I think they were questions you

9  asked to Dr. Strickler while she was on the stand.

10         THE COURT:  Right.  I was just trying to figure out

11 what's -- just because I asked the question, that doesn't mean

12 it's proper for rebuttal.  It would be the answer that

13 Dr. Strickler gave to my question; right?  That's what we're

14 talking about.

15         MR. KOCHERSBERGER:  That's correct, Your Honor.

16         THE COURT:  Okay.

17         MR. KOCHERSBERGER:  And you said:  "This is why "C"

18 had an episode of altered mental status and irregular breathing

19 on the morning of 9/28.  Do you agree with that statement?"

20 Dr. Strickler said she did not, and then you asked her why and

21 she gave a long reason as to why.

22         THE COURT:  Right.

23 BY MR. KOCHERSBERGER:

24 Q.  So given that, Dr. Scheller, is it your understanding with

25 respect to the specific -- let me back up.

1          Are you saying the specific cause of the seizure that "C"

2     had was the blood that was on the brain's surface?

3     A.    Yes, sir.

4     Q.    And how did you reach that conclusion?

5     A.    Knowing what the causes of seizures are, and knowing that

6     seizures do represent the brain being irritated by something.

7     There are a lot of potential irritants.  Drug irritants,

8     chemical imbalance irritants, infection irritants, and so on

9     and so forth.  And the only thing, based on my review of the

10    medical file, history, physical, labs and radiology, was that

11    "C's" brain was being irritated by something.  And you could

12    see that the blood was sitting there, irritating it.

13    Q.    Let me ask you this, and maybe it's me who's making this

14    into something that it's not.  Is it your understanding that

15    you disagree with Dr. Strickler and/or Dr. Hart that the blood

16    on the surface caused the seizure, or you just disagree as to

17    how the blood got there?

18    A.    I don't specifically remember their testimony.  I can't

19    say.  I can just say my impression.

20    Q.    Was there anything else that you observed in the medical

21    records, including the imaging of "C," that would have

22    identified the cause of the seizure that he had on the 28th?

23    A.    Well, the reason you do the imaging is to look for other

24    causes, tumor, infection, stroke, brain compromise, and none of

25    that was found on the MRI scan.

1  Q.   Got it.  Okay, now let's talk a little bit about retinal

2  hemorrhages, which is the next part of your opinion that was at

3  issue.  You said:  "Retinal hemorrhages typically are not an

4  indication of eye trauma and are certainly not specific to

5  abusive head trauma."  I believe at Page 24, Line 3,

6  Dr. Strickler disagreed with that to an extent.

7       But first, please just describe what it is that you're

8  saying here.

9  A.   So, I gave you a demonstrative, and I'm happy to use it.

10 But if the Court doesn't want me to use it, I won't use it.

11 Q.   I think you could probably just explain it at this point.

12 I don't know that the Judge wants a lot more exhibits.  But

13 let's see how the explanation goes.

14 A.   I always explain things better with pictures, but I'll do

15 my best.

16      If we can imagine the eye as a ball, and if we slice the

17 eye in half, we'll see all the little blood vessels, that line,

18 the inside of the ball.  Half of those blood vessels are

19 arteries, and those blood vessels are bringing blood to the

20 eye, and then half of them are veins and they're going to drain

21 that blood and bring it back to the heart.

22      So what a retinal hemorrhage represents is one or many

23 little drips of blood that come out of an eye vein.  Eye veins

24 are very fragile, just like all veins are fragile.  But these

25 are tiny little veins, so they're more fragile than most, and

1   it doesn't take a lot to make them bleed.  And the number one

2   cause in the world of retinal hemorrhages has nothing at all to

3   do with eye trauma or any kind of shaking or violence, or

4   anything like that.

5   Q.   I stopped at a portion of your opinion, and you seem to

6   have gone on.  All I'm asking you about is that first sentence,

7   that "retinal hemorrhages typically are not an indication of

8   eye trauma."  That part of it, what is it that you're saying

9   here?

10  A.   I'm saying that the eye is often a bystander to what's

11  going on in and around the brain, and so the most typical

12  scenario for retinal hemorrhages is when something is happening

13  in or around the brain indirectly affecting the eye.

14       An analogy would be if I go to a bar and two people near

15  me are having a fight, I might be indirectly struck or thrown

16  or something, but I'm not a part of the fight.  So the eye is

17  not part of the trauma yet.  Because the circulation is so

18  intimately connected, the eye will develop findings related to

19  what's going in the brain.

20            THE COURT:  What's being rebutted here?

21            MR. KOCHERSBERGER:  That was the indication at

22  Page 24, Line 3.

23            THE COURT:  I see, where Dr. Strickler is talking

24  about retinal hemorrhages?

25            MR. KOCHERSBERGER:  Right.  And Dr. Scheller is

1  saying that it's caused by the circulation issues, and we're

2  going to get to that opinion in a moment, not by actual

3  physical trauma to the eyeball, itself, which is where there

4  seems to be a disagreement.

5  BY MR. KOCHERSBERGER:

6  Q.    And so, how is it that the retinal hemorrhages actually

7  form if it's not trauma to the eye?

8  A.    If we can imagine a river, and the river is flowing, and

9  then there are these little tributaries flowing into the river,

10  if there's a blockage anywhere in that river, the tributaries

11  flowing into the river will back up, and sometimes they'll

12  overflow.  Well, that's what a retinal hemorrhage is, is a

13  backup of the flow of blood in these very small veins.  The

14  overflowing is this leakage of blood.

15        So, on the vein's trip from the eyeball to the heart,

16  there is a stop in the brain.  If there's something going on in

17  the brain that will affect circulation, that will back up the

18  retinal veins and cause them to leak, sometimes a little,

19  sometimes a lot.

20  Q.    Did you have any medical literature to describe this

21  mechanism of causing the retinal hemorrhages?

22  A.    Yes, I did, and I put them in the notebook.  The most

23  potent one is 25.

24  Q.    All right.  Tell us about the article that is identified

25  on the Notice as 25, and I'm about to mark as Defense

1  Exhibit 39.  What exactly does that tell us about this

2  mechanism that you were just describing?

3  A.   Doctors in California examined -- let me take it out

4  before I forget.

5       A group of doctors in California examined the eyes of

6  perfectly normal newborns and discovered that 20 percent of

7  them, one out of five, had retinal hemorrhages, and not only

8  did they have retinal hemorrhages, those hemorrhages involved

9  multiple layers within the retina and also were found

10 throughout the eyeball.  In other words, in the periphery or in

11 the middle of the eye.

12      So that tells me that -- clearly nobody has traumatized

13 these children.  They're born normally.  But we do know that

14 there are very dramatic changes in circulation and pressure

15 within the skull as a baby's born, so that's the most logical

16 explanation as to what causes retinal hemorrhages.  The number

17 one cause, being born.

18 Q.   Are you suggesting that "C" had retinal hemorrhages that

19 were there from the time that he was born?

20 A.   No, sir, not at all.  They almost always go away within a

21 few weeks.

22 Q.   So what does this have to do with "C's" situation?

23 A.   It helps us understand the mechanism.  We know that "C"

24 did have a pressure build-up, because he had fluid that didn't

25 belong there.  We know that "C" did have a problem with

1   circulation, because he developed a small acute hemorrhage.

2   Those two factors can combine to effect the brain circulation

3   and then have that secondary effect on the veins in the eye.

4           MR. KOCHERSBERGER:  Move to admit Defense Exhibit 39.

5           MR. MARSHALL:  Your Honor, I'm objecting.  It's a

6   birth trauma related injury, or it's trauma from birth.  It has

7   nothing to do -- in this case, he said that he wouldn't expect

8   this to have been the cause of the retinal hemorrhages in "C."

9   He's trying to do some sort of either -- like a transitional

10  property for how he gets to the injuries in "C."  But the

11  document that he's offering doesn't support his claim.  He even

12  admits it doesn't support his claim, because it should have

13  resolved within a few weeks.  "C" was eight months old, he

14  wasn't an infant, there's no support here.

15          MR. KOCHERSBERGER:  And Dr. Scheller is suggesting

16  that the way a retinal hemorrhage is formed in a newborn is as

17  a result of squeezing through the birth canal, causing

18  increased pressure in the veins of the brain circulation, which

19  then causes retinal hemorrhages in much the same way that the

20  increased pressure in "C's" head that was documented from a

21  different cause, but the same circumstance, increased

22  intracranial pressure, caused his retinal hemorrhages.

23          As he described in his opinion, it's the circulation

24  dynamics and the increased pressure that causes retinal

25  hemorrhage.  The retinal hemorrhage is not a direct result of

1  trauma, itself.  So I think it's just describing the mechanism

2  the same way, and in a pretty commonly observed way.

3          THE COURT:  Anything else, Mr. Marshall?

4          MR. MARSHALL:  I don't understand the -- well, and

5  maybe it's better for cross.  But it doesn't seem to -- to make

6  an accurate comparison, you would have to then say that "C" had

7  gone through something traumatic, which justifies the

8  prosecution's perspective, because what the article is saying

9  is that the birth trauma is part of the reason for the retinal

10  hemorrhaging.

11          And what Dr. Scheller is saying is that there's some

12  other kind of condition that he might have had.  The linkage

13  from that condition to this article seems remote, unless he's

14  saying that there's someone who put "C's" head in a vice and

15  squeezed his head like he was trying to come out of his

16  mother's vagina again, to cause those same kinds of injuries.

17  The comparison is not an apt comparison.

18          THE COURT:  Yes, I'm failing to see how it's an apt

19  comparison, so I'm ruling in favor of the Government on that.

20  The objection to Exhibit 39 is sustained.

21  BY MR. KOCHERSBERGER:

22  Q.   Is the situation of a newborn having increased

23  intracranial pressure different than the situation of a child

24  "C's" age having increased intracranial pressure?

25  A.   No.  The mechanism is the same.  One is caused by a birth

1   canal squeezing the skull, and one is caused by something

2   inside the skull that doesn't belong there.  And in this case,

3   it was fluid and a little bit of blood.

4   Q.   What methodology did you use to reach the conclusion that

5   it was this increased pressure that caused the retinal

6   hemorrhages?

7   A.   All neurologists know that problems of brain circulation

8   can cause retinal hemorrhages in any age.  And, again, when

9   there's a problem with brain circulation -- and let's just give

10  an example.  An aneurysm.  An aneurysm is when a blood vessel

11  bursts and starts to squirt blood inside the brain.  Clearly

12  the brain circulation is very, very dramatically affected.  All

13  neurologists, including myself, are taught that brain aneurysms

14  are a very well-known cause of retinal hemorrhage.  Nothing

15  happens to the eye when somebody has a brain aneurysm, what

16  does happen to the eye is that its circulation is indirectly

17  affected by the circulation of the brain.

18       So that same idea, that anything that can affect the brain

19  circulation can affect the eye, that could be true for a

20  newborn, that could be true for an old person with an aneurysm,

21  and it could be true with a child who has too much pressure

22  from too much fluid.

23  Q.   Is this at all a controversial thing within neurology?

24  A.   When you say this, what's "this"?

25  Q.   The fact that increased pressure causes retinal

1  hemorrhages.

2  A.   No, sir.

3  Q.   All right.  And then in your opinion, you say:  "To

4  summarize, "C" had a chronic intracranial fluid circulation

5  condition of infancy that is usually benign.  In his case, it

6  caused a small amount of bleeding and a seizure."

7      Dr. Strickler testified at some length about your use of

8  the term chronic intracranial fluid circulation condition.

9  That's at Page 40, Line 25 of her testimony.  What are you

10  describing here?

11 A.   Chronic subdural hygroma, which is a very well-known

12 medical term.  It's in just about all of these articles.  And

13 then the complications that arise from that which, again, are

14 in the medical literature that I provided.

15 Q.   So a chronic intracranial fluid circulation condition of

16 infancy, is that a diagnosis or a description, or what is that?

17 A.   That's -- it was an attempt to have lay people understand

18 what I had previously described in my letter medically.

19 Q.   Which was what?

20 A.   Chronic subdural hygroma of infancy.

21 Q.   All right.  Finally, you say:  "There's no evidence that

22 "C" was a victim of abusive head trauma."  What do you mean by

23 that?

24 A.   No conclusive evidence.  I had listed a bunch of findings

25 that might happen to a child who's been a victim of abusive

1  head trauma, and "C" didn't have any of those findings.  And I

2  can list them again.  They're in the letter.

3  Q.   Just tell us what you're referring to.

4  A.   Broken ribs, broken limbs, neck injuries, unexplained

5  external injuries, scalp swelling, skull fracture, and brain

6  injury.

7  Q.   Are you familiar with the diagnosis of abusive head

8  trauma?

9  A.   Sure.  Every pediatrician is trained in it.  I am a board

10  certified pediatrician, and certainly I do my best to keep up

11  with the literature.

12  Q.   And did you consider that as a possible diagnosis for "C"?

13  A.   Well, it's a rule-out diagnosis.  So if there is no

14  medical diagnosis, then you would consider it.  So I didn't get

15  to that point, because I discovered that "C" did have a medical

16  diagnosis.

17  Q.   And that medical diagnosis was what?

18  A.   Complications from a chronic condition that triggered his

19  seizure.

20  Q.   I think you described it, but was there any different

21  methodology that you used to reach that conclusion that you

22  haven't already described?

23  A.   No, sir.

24       MR. KOCHERSBERGER:  May I have just a moment, Your

25  Honor?  I think I'm done.

1          THE COURT:  Sure.

2    BY MR. KOCHERSBERGER:

3    Q.   Before we finish here, Dr. Scheller, we talked a little

4    bit about the retinal hemorrhage in newborns.  I think I forgot

5    to ask you, were there other articles that you considered that

6    bore on that same subject of the cause of a retinal hemorrhage?

7    A.   Sure.  Recently a Swedish panel of scientists tried to

8    evaluate the medical literature that assessed the importance or

9    relevance of retinal hemorrhages to the diagnosis of abusive

10   head trauma, and found that there was no science behind it at

11   this point.  It was all anecdotal.

12   Q.   Is that any of the things that we have in the materials?

13   A.   Yes, sir.  There's two, actually, references to it.

14   No. 17, and then a corresponding one is No. 4.  No. 4 is really

15   a response to those who criticized No. 17.

16   Q.   So what is the importance of No. 17 with respect to

17   retinal hemorrhage?

18   A.   The idea that all the medical literature, of which there's

19   a lot that documents retinal hemorrhage as a portion or as a

20   criteria for diagnosing child abuse, is all tainted with

21   circular reasoning.  In other words, we suspect the child is

22   abused, we know that retinal hemorrhage is a sign of abuse,

23   let's find the retinal hemorrhage and then that proves that

24   retinal hemorrhage is a sign of abuse.

25   Q.   And I apologize, I didn't ask my question very well.  I

1    was talking about other articles that describe the

2    pressure-caused retinal hemorrhages as the mechanism for a

3    retinal hemorrhage that are contained in the materials that you

4    provided, other than the one that the Judge ruled was

5    inadmissible because it involved newborns.

6    A.    Sure.  One of them is No. 27.

7    Q.    All right.  Tell us about that one.

8    A.    So, that looked at infants who are victims of abusive head

9    trauma and who weren't, and looked for retinal hemorrhages in

10   both, found retinal hemorrhages in both groups, and there

11   seemed to be, they couldn't conclude for sure, but there seemed

12   to be a connection between increased intracranial pressure and

13   retinal hemorrhage in both groups.

14   Q.    That was the document that was identified in the Notice as

15   No. 27, and I'm going to mark it here as Defendant's

16   Exhibit 40.  And that relates to the mechanism causing retinal

17   hemorrhages; is that what you said?

18   A.    Yes, the increased intracranial pressure that I suggested.

19   Q.    Were there any other articles?

20   A.    There's an article that I've written.  It was published I

21   think around 2017 or 2018, and it's not in this binder.  It's

22   about infants who are found to have retinal hemorrhage like "C"

23   who didn't have any brain injury.

24   Q.    How about any others in the materials, is there any?  Take

25   a look at No. 26, just to be sure.

1   A.   I don't want to get into that one.

2   Q.   Okay.

3            MR. KOCHERSBERGER:  All right.  So I would ask to

4   admit Defense Exhibit 40.  Again, it describes the

5   pressure-caused retinal hemorrhage mechanism that Dr. Scheller

6   has described both with respect to birth, with respect to the

7   patient in this case, and now with respect to a whole bunch of

8   others that were studied.

9            MR. MARSHALL:  No objection.

10            THE COURT:  It will be admitted for purposes of this

11   hearing.

12        (Defense Exhibit No. 40 admitted.)

13            MR. KOCHERSBERGER:  I have no additional questions,

14   Your Honor.  Thank you.

15            THE COURT:  All right.  Let's take a -- how much of a

16   break do you need?  Can we be back at 1:45, or is that pushing

17   it?

18            MR. MARSHALL:  That's fine, Your Honor.  I was going

19   to say 15 minutes.  But if the Court would prefer an extended

20   break, that's fine as well.  I wasn't sure how much time the

21   Court had available.

22            THE COURT:  Well, I had them, this morning, vacate

23   the stuff later on this afternoon.  In other words, we've got

24   to get this finished.

25            MR. MARSHALL:  Yes, sir.

1          THE COURT:  So does that work for you, coming back at

2   1:45?

3          MR. KOCHERSBERGER:  Whatever you like, Your Honor.

4   We had planned to be with you all day.

5          THE COURT:  In other words, if you're going to try to

6   grab a quick bite to eat, maybe we ought to do 2:00, then.

7   Does that work?

8          MR. KOCHERSBERGER:  Sure, that would be fine.  Thank

9   you.

10          THE COURT:  All right.  We'll be in recess until

11   2:00.

12   (Recess was held at 12:55 P.M.)

13   (In Open Court at 2:06 P.M.)

14          THE COURT:  You may be seated, Dr. Scheller.  Counsel

15   may cross-examine.

16          MR. MARSHALL:  Thank you, Your Honor.

17                    CROSS REBUTTAL EXAMINATION

18   BY MR. MARSHALL:

19   Q.   On direct examination in rebuttal, you talked about your

20   methodology when you treat a patient.

21   A.   Diagnose and treat, yes, sir.

22   Q.   And that there were four different things that you look

23   at.  Is that the same methodology that you use when you're

24   forensically consulting?

25   A.   Yes, sir.

1  Q.    All right.  In this case, you wrote a report?

2  A.    Yes, sir.

3  Q.    And that's Document 3 in the Government's exhibit list?

4  A.    Yes, sir.

5  Q.    You stated that there were four parts to your methodology.

6  Can you point in your report to where you talk about the

7  physical exam of the patient?

8  A.    Sure.  It's the second line.  Shall I read it, or not?

9  Q.    Second line of what page, sir?

10  A.    Right at the top.

11  Q.    Okay.

12  A.    Should I read it?

13  Q.    Sure.

14  A.    "I reviewed medical records in this case including records

15  of birth, pediatric visits, ER visits, hospitalization, and

16  follow-up."  Every single one of those contained physical exam

17  findings.

18  Q.    All right.  And where do you use -- in your findings,

19  where do you make mention of any of the physical findings that

20  "C" actually had?

21  A.    On the top of Page 2 in my version -- well, I'm sorry.

22  Let's start with the bottom of Page 1.  "Altered mental status

23  and irregular breathing," that's a physical finding.  And then

24  on the top of Page 2, "Right upper arm bruise."  That's another

25  physical finding.  And then just underneath there, "A head

1  circumference of 46 centimeters."  That's a physical finding.

2  Q.   What about medical history?  How did medical history --

3  you talk about medical history as one of the things that you

4  use in the formation of your diagnosis; is that correct?

5  A.   Yes, sir.

6  Q.   But you never took a medical history in this case?

7  A.   No, sir, I did not.

8  Q.   You stated you never read any of the police reports that

9  talked about the Defendant, about what happened in the case?

10 A.   I don't specifically recall.

11 Q.   Do you recall telling the attorney that you don't consider

12 the actions of the Defendant in making your diagnosis?

13 A.   Yeah, if I said that in my previous testimony, I may have.

14 I don't recall saying that.

15 Q.   You never spoke to the Defendant prior to the Daubert

16 hearing, the first Daubert hearing?

17 A.   That's correct.

18 Q.   You never spoke to any of the treating physicians in this

19 case?

20 A.   That's right.

21 Q.   You never spoke to the consulting physicians in this case?

22 A.   That's right.

23 Q.   You have a Certificate of Neuroimaging, but you never

24 spoke to Dr. Hart or any of the other radiologists in this

25 case?

1   A.   That's right.

2   Q.   Now, I want to start kind of with more of a general

3   question.  You constantly refer to this as a chronic subdural

4   hygroma.

5   A.   Yes, sir.

6   Q.   What caused it?  You never mentioned what was the cause of

7   his chronic subdural hygroma.

8   A.   I'm not sure.  I can only hypothesize.

9   Q.   What is your hypothesis?

10  A.   The most common cause is birth, and what happens at birth

11  to a number of children, not everybody, is that the brain, due

12  to the squeezing of the birth canal, the brain moves away a

13  little bit from the inside of the skull and creates a space.

14  And that space could just disappear, or that space could

15  accumulate fluid and turn into a chronic subdural hygroma.

16  That's the number one cause in infants.

17  Q.   And you've diagnosed "C" as having this condition.  So

18  you're saying now that you think he obtained it from birth?

19  A.   Possibly.

20  Q.   What would have been another cause?

21  A.   A minor trauma in the first few months of life that

22  perhaps would have gone unrecognized because maybe he cried for

23  a minute and stop crying, but it was enough to, again, to move

24  the brain just a little bit away from the inside of the skull

25  and cause fluid to accumulate there.

1   Q.   You've never referred to that statement before, have you?

2   A.   I don't understand the question.

3   Q.   You've never -- you stated before that chronic subdural

4   hygromas are not the result of trauma.

5   A.   I mean, significant trauma.  But I have said that.  I have

6   said those exact words.  But what I mean is a significant

7   trauma, a trauma that people would recognize.  Falling down the

8   stairs.

9   Q.   Dr. Scheller, do you agree that it's important to be

10  precise when we're talking about a diagnosis?

11  A.   For sure.

12  Q.   And when we're talking about a brain injury?

13  A.   For sure.

14  Q.   Now you're saying that it could be the cause of trauma

15  when you previously said it was not the cause of trauma.  Do

16  you understand how that could be contradictory and confusing?

17  A.   I never said anything was the cause of trauma.  It may

18  have been caused by trauma.  I'm trying to be precise, so if we

19  can be precise with the questions, I'd appreciate it.

20  Q.   So is your supposition in this case that it's birth

21  trauma?  Is that what you believe happened?

22  A.   It may be.  I'm not sure.

23  Q.   And you were here for the first Daubert hearing in

24  November when Dr. Hart testified, were you not?

25  A.   Yes, sir.

1   Q.    Do you recall as part of his testimony the discussion of

2   the Rooks article?

3   A.    Sure.

4   Q.    Have you read the Rooks article?

5   A.    I'm very familiar with it, yes, sir.  In 2007, I believe,

6   it was published.

7   Q.    What was one of the important findings in the Rooks

8   article, if you're so familiar with it?

9   A.    It really only had one important finding, and that was

10  that 45 percent of perfectly normal children did have MRI

11  evidence in the first few days of life of acute subdural

12  hematoma, although they were mostly very small.

13  Q.    And what happened to those subdural hemorrhages?

14  A.    We don't know, because only a small percentage of the

15  children were followed over time.

16  Q.    So you disagree with their conclusion that a subdural

17  hemorrhage after one month of age is unlikely to be birth

18  related?

19  A.    That's actually not their conclusion, if one reads a

20  little bit further into the article.  That's a

21  misrepresentation.

22  Q.    All right.  Can you read me the last line of the

23  conclusion statement?

24  A.    Sure.

25  Q.    And if you need to, confirm it with the Rooks article.

1   A.   "Subdural hematoma after one month of age is unlikely to

2   be birth related."

3   Q.   Okay.  So you're saying that's not their conclusion?

4   A.   Well, they wrote it.

5   Q.   Did you just not tell me to read further?

6   A.   I did.

7   Q.   But that's the last line of the article.  So it's

8   impossible to read further; correct, Dr. Scheller?

9   A.   Except for the Acknowledgments, you're right.

10  Q.   So you can't read any further.  Their conclusion is what?

11  A.   Well, I'll read it again.  "Subdural hematoma after one

12  month of age is unlikely to be birth related."

13  Q.   And you're saying that's not what their finding was?

14  A.   That is not an appropriate conclusion from what they

15  studied.

16  Q.   And you've done how many studies?

17  A.   I'm sorry?

18  Q.   How many studies have you done?

19  A.   A number of them.  I've worked on a lot of projects and

20  I've written some articles.

21  Q.   How many studies related to birth trauma?

22  A.   I have one that I can think of offhand.

23  Q.   And you didn't cite it for your conclusions today, though,

24  did you?

25  A.   I did not.

1   Q.   The Rooks article also says that all subdural hematomas

2   have resolved at the age of three months.

3   A.   No, it did not say that.

4   Q.   Let me continue on.

5         THE COURT:   I'm sorry, who is the author of the

6   article you've got right now?

7         MR. MARSHALL:   It's the Rooks article.

8         THE COURT:   Is it R-o-o-k-s?

9         MR. MARSHALL:   R-o-o-k-s.   Actually, the title of the

10  article, which I did not mention, is, "Prevalence and Evolution

11  of Intracranial Hemorrhage in Asymptomatic Term Infants."

12        THE COURT:   Thank you.

13  BY MR. MARSHALL:

14  Q.   Now, as part of this article and this study -- and there

15  was over 100 different patients; is that correct?

16  A.   They did MRIs on 100 infants, neonates.

17  Q.   And as you mentioned, it was approximately 46 that had

18  findings?

19  A.   Forty-six out of 100 had an acute subdural hematoma

20  immediately after birth.

21  Q.   And one of the things it notes is that all of them were

22  asymptomatic; correct?

23  A.   Yes.

24  Q.   "C" was symptomatic?

25  A.   Yes, sir.

1  Q.   "C" was also eight months old?

2  A.   Yes, sir.

3  Q.   He had an altered mental state, his eyes were glazed, his

4  eyes were deviated to the side and not focused, he had a

5  seizure, he had breathing problems, he was vomiting, and he was

6  limp?

7  A.   That's a correct description of his findings on the day in

8  question.

9  Q.   Well, it was beyond the day in question; correct?

10  A.   His symptoms did continue, yes, sir.

11  Q.   They lasted several days, because he was hospitalized for

12  several days due to the ongoing altered mental state and

13  condition?

14  A.   Yes, sir.

15  Q.   Now, you were talking at one point about the different

16  types of brain injuries, and that you would expect them to show

17  up on the MRI; is that correct?

18  A.   Yes, sir.

19  Q.   Does a concussion show up on an MRI?

20  A.   No, sir.

21  Q.   Is a concussion considered a brain injury?

22  A.   Possibly.

23  Q.   You're the neurologist.  Is a concussion considered a

24  brain injury?

25  A.   And I'm saying possibly.

1   Q.    What else would it be if it's not a brain injury?

2   A.    A brain irritation.  A brain malfunction.

3   Q.    Okay.  Now, it was part of your testimony today that "C"

4   did not have any brain injury?

5   A.    That's right.

6   Q.    It's a part of your testimony today that there was no

7   brain injury on any of his scans?

8   A.    That's right.

9   Q.    That even in the, and I may misuse the term, but like even

10  in the scan that had the diffusion of the MRI, you're saying

11  that there was no sign of injury?

12  A.    That's right.  That's how the radiologist interpreted it,

13  and that's how I interpreted it.

14  Q.    Okay.  Now, an acute subdural hematoma would be considered

15  a brain injury?

16  A.    No, sir.

17  Q.    What would an acute subdural hematoma be considered?  Is

18  that a normal finding?

19  A.    Absolutely not.

20  Q.    If it's not a brain injury, what do you consider it?

21  A.    It's a collection of blood in between the brain and the

22  inside of the skull.  There is sometimes an accompanying brain

23  injury, but not always.

24  Q.    What causes subdural hematomas?

25  A.    The number one cause in the whole world is an impact

1  injury to the outside of the skull.

2  Q.   All right.  And what about a subarachnoid injury?

3  A.   We don't use that term subarachnoid injury.  We might say

4  subarachnoid hemorrhage.  I don't use the term subarachnoid

5  injury.

6  Q.   Okay, subarachnoid hemorrhage.

7  A.   What's the question?

8  Q.   Would that be considered a brain injury?

9  A.   No, but that's much more likely to produce one than a

10  subdural hematoma.

11  Q.   So when you're saying that there were no signs of brain

12  injury on the scans, you would disagree with the findings of

13  Dr. Hart when he listed the different brain injuries?

14  A.   I don't believe Dr. Hart found any brain injuries, either.

15  He did document a subdural hematoma, fluid collections, but I

16  don't believe he documented any brain injury.

17  Q.   Well, he documented acute subdural bilateral hematomas.

18  A.   That's correct.  That's outside the brain.

19  Q.   Including a tearing of the dura.

20  A.   I don't remember him saying anything about a tearing of

21  the dura.  I don't remember that.

22  Q.   We'll let the record speak on that.  He talked about an

23  intraventricular hemorrhage, and that's within the brain; is

24  that right?

25  A.   That's correct.  That's subarachnoid.

1    Q.    So that's within the brain?

2    A.    Not really.  It's not in the brain substance, it's in the

3    fluid that is circulating within and around the brain.  But

4    it's not in the brain, per se.

5    Q.    And this was a hemorrhage?

6    A.    I'm sorry?  I don't understand.

7    Q.    It was diagnosed as a hemorrhage?

8    A.    There was a small hemorrhage that was subarachnoid that

9    was in the ventricular system, the lakes of fluid that are

10   inside the brain.

11   Q.    And he said that it was not likely from the subarachnoid

12   injury?

13   A.    Well, that's an opinion, but he's entitled to his opinion.

14   Q.    Do you disagree with his opinion?

15   A.    Well, yeah.  In order for blood to get into the lakes, it

16   has to get into the space underneath the arachnoid membrane,

17   what I referred to before as underneath the ceiling.  And so

18   there had to be blood subarachnoid.

19   Q.    And the cause for this kind of an injury would be a

20   trauma?

21   A.    One of the causes, absolutely.

22   Q.    Okay.  What are the other causes?  Aneurysm?

23   A.    Aneurysm is a cause.

24   Q.    Metabolic issues?

25   A.    I wouldn't -- it would be -- I wouldn't consider metabolic

1  disease as a cause of subarachnoid hemorrhage.

2  Q.    But according to Dr. Hart, all the other causes have been

3  ruled out leaving trauma as the most likely cause.

4  A.    That was his opinion, yes.

5  Q.    He also found likely acute hemorrhage over the cerebellar

6  hemispheres with blood over and under the tentorium?

7  A.    Yes, sir.

8  Q.    And previously you said this could have been from flowing

9  blood.

10  A.    I don't remember.

11  Q.    The multiple focal points of injury or hemorrhage on the

12  brain, or in the head, could have flowed from one area to the

13  other?

14  A.    I probably said that at the trial in November.  I don't

15  remember saying it today.  I may have said it.

16  Q.    Would you agree or disagree that it would be unlikely from

17  blood to flow from the other spaces into the tentorium?

18  A.    It's a question that doesn't make sense neurologically, so

19  I can't answer it.

20  Q.    So if there is a hemorrhage in the tentorium, a subdural

21  hemorrhage, are you saying it is likely or unlikely that these

22  would have been caused by the same injury?

23  A.    So, I'm assuming there's an injury?

24  Q.    Yes.

25  A.    So there's still a problem with the question, and I'm

1  happy to help you clarify, because the question doesn't make

2  sense neurologically.

3  Q.   Go for it.

4  A.   The tentorium is a piece of skin, and that piece of skin

5  is the same piece of skin as the dura.  So when there is a

6  subdural hematoma or a subdural hemorrhage, then there's blood

7  in between that piece of skin and the brain.

8       Now, that piece of skin covers that back lobe of the brain

9  called the cerebellum, and I think what you're referring to is

10 Dr. Hart's, I guess, pointing out and finding it very important

11 that not only is there blood above that piece of skin -- in

12 other words, a subdural hematoma in between the main part of

13 the brain and the piece of skin -- but there's also a blood

14 collection between the back lobe of the brain, the cerebellum,

15 and the piece of skin.  So that's over the tentorium, or

16 supratentorial, and infratentorial.

17      So the way I'm understanding your question is, do I agree

18 with Dr. Hart that isn't that an important finding, that not

19 only is there blood above the tentorium, above the piece of

20 skin, but there's also blood underneath it.  And I don't.  I

21 think it's the same blood and it just tracks from above to

22 below.

23 Q.   Now, all those different, for lack of a better term,

24 either injuries or hemorrhages within the head, you're saying

25 none of those are brain injuries.  But would you call them

1  injuries?

2  A.   I'd say they're medical problems.   In other words, if

3  somebody with hemophilia bleeds, would I call that an injury?

4  No, it's a medical problem.   That person is bleeding.   It might

5  cause an injury, but it's a medical problem.   It's a very

6  significant one.   An injury to me implies that there's been

7  some kind of impact or trauma or something, and I don't want to

8  concede that.

9  Q.   I know.   Your argument seems to be a little bit circular,

10 because you're saying that there is some sort of blood caused

11 here.   You've already said that we've ruled out the other

12 causes, so that the most likely other cause here is trauma.

13 But now you're saying that you're not willing to say that this

14 is an injury, even though it's the only remaining cause that it

15 could be.

16     I mean, in your practice, you do a differential diagnosis;

17 is that right?

18 A.   I do, yes, sir.

19 Q.   So you go through, you look at the different potential

20 problems and you rule them out.   If everything has been ruled

21 out except for trauma, what else are you left with?

22 A.   That's right, and that's how Dr. Strickler came to her

23 conclusion.   And I disagree with that.   I don't believe that

24 there was trauma.

25 Q.   So then what was the other cause?

1  A.   There was a chronic medical condition that allowed

2  subdural hematomas to develop either spontaneously or from a

3  minimal injury, one that we would never pay attention to

4  otherwise, and that chronic medical condition is called a

5  subdural hygroma, and that's what caused the acute subdural

6  hematomas that you are referring to that are usually caused by

7  an impact injury or some kind of trauma.  But in this case, I

8  don't believe they were.

9  Q.   Okay.  What was their causation, if it was not from

10  trauma?

11  A.   A complication of chronic subdural hygroma --

12  Q.   What --

13  A.   -- as I stated in my report.

14  Q.   I'm sorry to interrupt you.  But a hygroma is a condition?

15  It's where there is fluid on the brain; correct?

16  A.   Fluid in between the brain and the inside of the skull,

17  that's right.

18  Q.   And on an MRI scan, it's indistinguishable -- or it's hard

19  to tell exactly what it is.  It does not look like CSF, like

20  you described, and it doesn't look like blood?

21  A.   That's right.  Fresh blood.  It doesn't look like fresh

22  blood.

23  Q.   So it looks like some sort of other fluid, possibly a

24  mixture of CSF and blood?

25  A.   Yes.

1   Q.   All right.  They don't spontaneously occur, do they?

2   A.   Hygromas?

3   Q.   Yes.

4   A.   To our knowledge, they don't.

5   Q.   In infants.

6   A.   I'll say in many cases, we don't know what the reason is.

7   And we blame it on birth, but we're not positive.

8   Q.   Now, you go back to saying you blame it on birth.  You

9   have the Rooks article; is that correct?

10  A.   Yes, sir.

11  Q.   All right.  Will you look at the Rooks article again, in

12  the second to the last sentence in the Results section?

13  A.   Second to last sentence?  Okay.

14  Q.   "Most SDHs" -- subdural hemorrhages, in this case --

15  "present at birth were" -- is that greater than? -- "three

16  millimeters and had resolved by one month, and all resolved by

17  three months on MR imaging."  Is that right?

18  A.   I'm not on the right page.  I'm on Page 1085.

19  Q.   I'm reading from the top in the Results section, in the

20  Introduction.

21  A.   Oh, in the abstract?

22  Q.   Yes.

23  A.   Oh, sorry.  Hold on.  Okay, try me again.

24  Q.   "Most subdural hemorrhages present at birth were greater

25  than three millimeters" -- is that right, or is that less than?

1   A.    Less than.  Less than three millimeters.

2   Q.    -- "less than three millimeters and had resolved by one

3   month, and all resolved by three months on MR imaging."  Is

4   that right?

5   A.    You quoted it right.  It's very misleading.

6   Q.    Oh, okay.  So, you're claiming that this is some sort of

7   birth injury.  Dr. Hart presented you with evidence in the

8   Rooks article that there were no studies that have shown that

9   there's been injury from birth past three months.  Where are

10  you -- other than what you said was experience, on

11  cross-examination, what other studies are you relying on?

12  A.    Well, they are in front of me here in this pile, and I can

13  name several of them offhand.  The Cho article that I referred

14  to, which is Exhibit 29.  The four K.S. Lee articles

15  basically --

16  Q.    Let's go back.  Let's talk.  The Cho article, which you

17  said is Exhibit -- I'm sorry; I don't have the right numbers,

18  unfortunately.

19  A.    I have it as Exhibit 29.

20  Q.    I have the book in front of me, I'm sorry.  What was it in

21  the book, do you recall?

22  A.    I could tell you.  One moment.  22.

23  Q.    All right.  Where does it -- show me in the article where

24  it talks about birth injuries lasting longer than three months.

25  A.    If you take a look at Page 2 of the article, which is

1  actually Page 274 --

2  Q.   Sure.

3  A.   -- on the top, it's the fourth column, "Cause of SDFC."

4  So the term they're using is subdural fluid collection.  So,

5  what was the cause?  If we look, one, two, three, four, five,

6  six, at least, that I can count, are what they call idiopathic.

7  Idiopathic means they had no clue what caused it.  When there

8  is no clue what might have affected a young infant to cause a

9  subdural hygroma, the only trauma every young infant has been

10 through is birth.

11 Q.   Okay, so it doesn't attribute it to birth, you're

12 attributing it to birth.

13 A.   In this case.

14 Q.   You're the only person that has made that leap.  The

15 article doesn't make that leap.

16 A.   I don't know.  I'll have to check the discussion.

17 Q.   You said that you used this to form the foundation of your

18 belief, so I'm assuming it supports you.

19 A.   It does support me.

20 Q.   Okay.

21 A.   I'm sorry; are you waiting for me?  I'm waiting for you.

22 Q.   You said you were going to find it in the discussion.  I

23 was waiting for you.

24 A.   All I see is that they can't explain why these children

25 had subdural hygromas, but they did present themselves within a

1  few months after birth.

2  Q.   All right.  So it's unknown?

3  A.   They called it unknown.

4  Q.   All right.  And so, when you say it's unknown, it's

5  possible that it could still be some sort of trauma that was

6  not seen?

7  A.   Sure.

8  Q.   It's possible that it was trauma that was inflicted and

9  nobody is reporting?

10  A.   Sure.

11  Q.   It's possible that it was trauma that the caretaker that's

12  there just didn't see?

13  A.   That's right.

14  Q.   So unknown doesn't necessarily have to -- you made it

15  sound like unknown automatically was birth trauma.

16  A.   Yes, sir.

17  Q.   Unknown is unknown?

18  A.   Unknown is unknown.  But they did make allowances for

19  other types of traumas that they did identify in this article.

20  Q.   All right.  So which other ones talk about birth trauma

21  being a cause?

22  A.   I'll take a moment.

23  Q.   Because it's my understanding, Dr. Scheller, this book you

24  provided to defense counsel; is that correct?  The articles in

25  this book, not necessarily the book, itself.

1    A.    Yes, sir.

2    Q.    And you provided that book to them saying that these

3    articles supported your foundational beliefs that you wrote in

4    September of 2017; is that right?

5    A.    That's right.

6    Q.    All right.  So I'll give you a second.

7    A.    I'm looking at the K.S. Lee article in 1994.

8    Q.    In the book, which one was that?

9    A.    I'll find it in a moment.  18 in my version of the book.

10   Q.    Okay.

11   A.    And I'm reading from Page 553, where it says, Discussion.

12   "TSH" -- which stands for traumatic subdural hygroma -- "occurs

13   most often at the extremes of life."  That's the first

14   sentence.  Skip a sentence, and then the third sentence says:

15   "In the infant the brain is quite compressible, and in the

16   elderly, brain atrophy creates a potential space where fluid

17   can easily collect."  So it's the same idea.

18   Q.    Where does it say birth?

19   A.    Well, that's the only thing I know that happens to every

20   child, that happens in the first few months of life.

21   Q.    All right.  This, like many of the other K.S. Lee

22   articles, all refer to trauma; right?

23   A.    Yes, sir.

24   Q.    You're saying that your hygroma is a nontraumatic injury.

25   So how do all these articles that refer to trauma support your

1  finding that you claim is a nontraumatic injury?

2  A.   Every one of these articles, in addition to mentioning

3  that subdural hygroma comes from trauma, also mentioned that

4  trauma can be trivial or minimal, and to me, that's no trauma.

5  Q.   Okay.  So you're playing a semantics game where minimal

6  trauma, it just equals no trauma?

7  A.   Yes, sir.

8  Q.   So now you are the one that gets to determine what level

9  of trauma is actual trauma versus no trauma?

10 A.   All these articles did.

11 Q.   What is minimal trauma?

12 A.   That's minimal trauma.  I just hit myself on the head with

13 this.

14 Q.   Did it cause you a seizure?

15 A.   No, sir.

16 Q.   Did it cause you vomiting?

17 A.   I don't have a preexisting condition.

18 Q.   Going back, you said you provided this book, and so far

19 you've only been able to provide one article, after several

20 minutes you found one article that you believe supports you,

21 but it doesn't actually mention birth trauma in the discussion.

22 A.   That's right.

23 Q.   And you said you provided this book to defense counsel, or

24 the articles in the book to defense counsel?

25 A.   Yes, sir.

1  Q.    You stated that these are the articles that helped form

2  your opinion?

3  A.    That and my experience, yes, sir.

4  Q.    And that your opinion was written in September 2017, is

5  when it was dated?

6  A.    Yes, sir.

7  Q.    So how did you rely on two articles that were dated in

8  2018?  Articles that were written after, how did they help

9  provide the foundational beliefs in your report written a year

10  earlier?

11  A.    You're right.  If they were written in 2018, then they did

12  not help me write my report in 2017.

13  Q.    So this was a mistake?

14  A.    Oh, I don't know that it was a mistake.  The attorney

15  called and said, what articles did you rely on, and these are

16  the articles in my knowledge base.

17  Q.    Okay.  So when he asked for the articles that you relied

18  on, you provided articles from after your thing was written,

19  and you claimed that that's what you relied on?

20  A.    The principles and the ideas in the articles are ideas

21  that I'm very familiar with from my experience and from older

22  articles.  But you're right, I wrote my report in 2017, and

23  there's at least one article from, I believe it's from Lee, in

24  2018.  Unless -- it is possible that I did get an early

25  release.  Sometimes they do have early releases of articles and

1   I do get them.  So I'm not sure.  But it is possible that I

2   didn't see it until after.

3   Q.   Now, you also referred to these as chronic subdural

4   hygromas?

5   A.   Yes, sir.

6   Q.   Now, that is a term that is in disfavor; is that correct?

7   A.   By Dr. Wittschieber, sure.

8   Q.   All right.  So which of these other articles talk about

9   chronic subdural hygromas?  They refer to subdural hygromas,

10  they refer to chronic subdural hemorrhages, but they don't

11  refer to chronic subdural hygromas, do they?

12  A.   They absolutely do, and I'm happy to find them.

13  Q.   Sure, find one for me.

14       Are you still on the first article, or are you on other

15  articles now?

16  A.   I'm going through all of them.

17  Q.   Just the articles that were admitted.

18  A.   Sure.

19  Q.   There were a handful I know that were not admitted, and

20  that would not benefit anyone at this point.

21  A.   I'm reading a sentence from K.S. Lee's article of 1998.

22  Q.   Was that what was provided as 16?  "The Pathogenesis and

23  Clinical Significance of Traumatic Subdural Hygroma"?

24  A.   Yes, sir.

25  Q.   Okay.  Where does it mention chronic subdural hygroma?

1   A.   It says the following words, which are:  "Subdural

2   hygromas" -- which is SDGs, which is Dr. Lee's shortening of it

3   -- "develop as delayed lesions."  I'm in the section Natural

4   History and Evolution.  "Then they change over time.  The fate

5   of subdural hygromas depends on the dynamics of absorption and

6   expansion.  They continue to grow for a time, and then reduce

7   in size."  So that's what chronic means.  In other words,

8   they're there for a time.  The word is not mentioned, but I'll

9   find it.  He says it elsewhere.

10  Q.   Okay.  He does refer to subdural hygromas and he does

11  refer to chronic subdural hematomas or hemorrhages.

12  A.   It's in the illustration on Page 29 in K.S. Lee's article

13  of 2015.  "History of Chronic Subdural Hematoma."

14  Q.   Which one is that, just so we're clear?

15  A.   It's No. 19, and it's the illustration on Page 29.

16  Q.   For the record, I think that was submitted as 32.

17       On that one, the image that you're saying, he puts a

18  question mark after "chronic," though; right?

19  A.   He does.

20  Q.   That's odd.  He doesn't put a question mark by

21  hemorrhage --

22  A.   That's true.

23  Q.   -- or hematoma.

24           MR. KOCHERSBERGER:  I object to the relevance of all

25  of this, Your Honor.

1          MR. MARSHALL:  If he thinks that his diagnosis of

2   chronic subdural hygroma isn't relevant, then I don't know why

3   we're here.

4          THE COURT:  I'll overrule.  You may continue.

5   BY MR. MARSHALL:

6   Q.   Now, you had it in the graph, but did you see it in that

7   article when you were flipping through, other than the picture?

8   A.   I'm happy to look through it.

9   Q.   I thought you were, sir.  Let me remind you, these are the

10  articles that are foundational to your opinion.

11  A.   I'm sorry; what was the question?

12  Q.   You said these are the articles that are foundational to

13  your opinion that it's a chronic subdural hygroma, and now ten

14  minutes later we still don't have one article that mentions the

15  term chronic subdural hygroma from your foundational medical

16  literature that you provided; is that correct?

17  A.   That's correct, except for the one that I mentioned.

18  Q.   All right.  You said that -- there was one in the graph,

19  but it's not in the body of the article.  You haven't found it,

20  have you?

21  A.   I can't say it's not in the body of the article.  I'm

22  happy to take the time to read it, if you'd like.

23  Q.   Well, I'm going to move on.  It's been ten minutes, and

24  you haven't found anything.

25          I'm going to jump back to the article you just mentioned,

1  the K.S. Lee article from 1998.  That was 16 in the book.  It

2  actually illustrates some problems using the subdural hygromas.

3  In the middle of the second paragraph in the Diagnosis on

4  Page 599, it talks about:  "However, an absolute distinction

5  between a subdural hygroma and a chronic subdural hematoma is

6  not only difficult, but actually impossible in a significant

7  number of cases."  Is that correct?

8  A.   Yes, sir.

9  Q.   And you -- jumping back to the term chronic subdural

10 hygroma, Wittschieber, in the article that you said was

11 foundational and put in your book, mentions that the term

12 chronic hygromas should be "principally avoided as it is a very

13 imprecise and pathogenetically insufficient description."

14 A.   That's his opinion, yes.

15 Q.   So his opinion is your description of the diagnosis is

16 very imprecise and pathogenetically insufficient?

17 A.   That's right.

18 Q.   Also in that Wittschieber article, it talks about --

19 again, it's in the abstract.  "But if other infrequent reasons

20 can be excluded, the presence of subdural hygromas strongly

21 suggests a post-traumatic state and should prompt the physician

22 to search for other signs of abuse."

23 A.   I'm sorry; what was the question?

24 Q.   That's what it says; right?  It talks about subdural

25 hygromas --

1   A.    Well, that's actually what Dr. Wittschieber says.

2   Q.    -- being in a post-traumatic state?

3   A.    That's right.

4   Q.    Trauma being inflicted?  In fact, in the article by

5   Wittschieber, he basically says there are two primary causes

6   for the subdural hygromas.  One is the remains of a previous

7   subdural hemorrhage, and the other is, "Subdural hygromas have

8   been verified by traumatically induced tears in the arachnoid

9   membrane"?

10  A.    That's what he writes.

11  Q.    You found another cause somewhere?

12  A.    The cause I explained to you earlier, about the brain

13  moving away from the inside of the skull.

14  Q.    Okay.  And that is in elderly patients; right?

15  A.    Elderly and infants.

16  Q.    And despite that, you said that "C" did not have extra

17  space, extra axial space?

18  A.    I don't understand the question.

19  Q.    Are you now saying that you think that he had extra axial

20  space and that a hygroma magically appeared in his head?

21  A.    That's how hygromas do appear.

22  Q.    By magic?

23  A.    From space that opens up between two pieces of tissue that

24  should be squeezed together.

25  Q.    Except the article says it's from trauma.

1   A.    Dr. Wittschieber believes that, sure.

2   Q.    So you think that it's not just fluid, like CSF, that

3   would normally fill a space like that, you are saying that it

4   is hygroma, which is some sort of mixed density fluid that

5   contains another fluid, most likely blood and CSF, that is

6   nontraumatic filling a space that happens to appear?

7   A.    That's right.

8   Q.    Okay.  Can you show any article that shows chronic

9   subdural hygromas of a minor that were nontraumatic that caused

10  either chronic subdural hematomas or the injury like you were

11  describing?  Were there any articles that supported your

12  opinion?

13      Wittschieber said it was trauma.  The Lee article said it

14  was trauma.  The Cho article I think said it was trauma, I

15  don't remember.  But which article supports your idea that it

16  was a nontrauma formation of a hygroma in an infant?

17  A.    Well, at least two.  You were the one that was pushing the

18  idea that idiopathic is not trauma, and so in the Cho

19  article --

20  Q.    Ultimately you agreed, unknown is unknown; right?

21  A.    I do agree, unknown is unknown.  But to me, unknown means

22  that this child suffered a birth injury, because that's the

23  only trauma we've all been through.

24      So the Lee -- I'm sorry.  The Cho article has a number of

25  cases of subdural hygroma without any known trauma, and then

1  the Park article -- no, it's not Park.  It's Lee.  The Lee

2  article from 2018 also has a number of cases of subdural

3  hygroma that are not trauma related.

4  Q.   Okay.  Jumping back, you said that the only trauma you

5  think is a birth trauma.  In this case, "C" had other signs of

6  trauma, did he not?

7  A.   No, sir.

8  Q.   Okay.  He had a bite on his shoulder.  That was not a

9  trauma?

10 A.   If you can explain to me how a bite on the shoulder can

11 cause something wrong with the brain, then I'm very happy to

12 listen.

13 Q.   Your definition said any unexplained trauma.  I'm asking

14 for any trauma on the body.

15 A.   That's explained trauma.

16 Q.   Okay, that's explained trauma.  You said there was no

17 other trauma.  A bite mark is trauma?

18 A.   A bite mark is trauma, and it's trauma to the skin.

19 Q.   Okay.  He had a circular abrasion in the middle of his

20 back.  That's a sign of trauma?

21 A.   Might be.

22 Q.   Okay, what else could it be?

23 A.   Sleeping on something, being pushed against some kind of

24 toy.  It could be anything.

25 Q.   What about the tear in his lip?

1   A.   In his?

2   Q.   Lip.

3   A.   Might be a sign of trauma, might not be.

4   Q.   Okay.  So you're ignoring findings from the physical

5   examination that you said was very important?

6   A.   I'm ignoring findings that are not conclusive in any way.

7   Q.   Okay.

8   A.   A skull fracture in conclusive.

9   Q.   Instead, you're relying on something that you think from

10  your personal experience exists when there's no data to support

11  it, and you're saying that you're going to ignore the actual

12  factual findings of medical doctors that saw the patient?

13  A.   That's not at all what I said, but you're welcome to

14  interpret it however you'd like.

15  Q.   Okay.  How is a subdural hygroma a circulation condition?

16  A.   All fluids in the body circulate, including spinal fluid

17  and including dural fluid.  The dura is a piece of skin, but

18  fluid does circulate in it.  And so that's a circulation

19  condition.

20  Q.   Does it have a membrane?

21  A.   I'm sorry?

22  Q.   Well, never mind.

23       How did the blood on "C's" brain -- you said he had a

24  seizure basically because there was blood on his brain.  How

25  did he get blood on his brain?

1  A.   Well, from either a leaky membrane or from a very small

2  blood vessel crossing the surface of the brain to the inside of

3  the skull that leaked, that was stretched and leaked some blood

4  onto the brain.

5  Q.   A common way for those to be stretched and leak is shaking

6  or trauma, a whiplash injury?

7  A.   It might happen.

8  Q.   But you still say it is a nontrauma finding?

9  A.   Yes, sure.

10  Q.   Traditionally the arachnoid layer is an impermeable

11  membrane.  But you're saying it could be leaky?

12  A.   The idea that's put forth in all these articles -- there's

13  a problem.  The problem is -- when you do an MRI scan and look

14  at the spinal fluid and you look at the dural fluid, they're a

15  different color.  And so there is fluid there.  A lot of people

16  think there's spinal fluid that seeps through the membrane and

17  then combines with dural fluid and makes it thicker.  Nobody is

18  really sure.  But it does seem to be a mix of spinal fluid and

19  thicker dural fluid.

20  Q.   You also talked about retinal hemorrhages.

21  A.   Yes.

22  Q.   Can trauma cause retinal hemorrhages?

23  A.   Sure.

24  Q.   You mentioned that, I think it was the veins, that blood

25  backed up in the veins.  Are you saying that there was a clot

1  in "C" that caused these injuries?

2  A.    No, sir.  Just a backup.

3  Q.    And correct me if I'm wrong, but you're saying it's your

4  understanding that he had increased cranial pressure that

5  caused his retinal hemorrhages?

6  A.    Yes, sir.

7  Q.    All right.  Where in the medical records did you see that?

8  A.    The fact that there was fluid in a place where it doesn't

9  belong is evidence that he had increased intracranial pressure.

10 Q.    But you said it was minor because it wasn't from a trauma.

11 A.    It's minor in most people, but it still causes pressure.

12 There's something where it doesn't belong.

13 Q.    What in the workup indicates that there was increased

14 intracranial pressure?

15 A.    Fluid in a place where it doesn't belong, and blood in a

16 place where it doesn't belong.

17 Q.    But it wasn't any -- is it the Cushing's Triad?  Were

18 there any signs of a Cushing's Triad in "C's" case?

19 A.    I didn't see any.

20 Q.    Is the Cushing's Triad generally something you'd look for

21 in intracranial pressure?

22 A.    If there's a very dramatic increase, yes, sir.

23 Q.    So you're now saying that a very minor increase in

24 intracranial pressure will lead to retinal hemorrhages of a

25 minor?

1  A.   I never said the word minor.  I think you're going from

2  dramatic to minor, and I'm happy to either try to answer the

3  question or you could ask it a different way.

4  Q.   I've asked you repeatedly, what in the medical records

5  indicates there was an increase in intracranial pressure?

6  A.   Fluid in a space where it doesn't belong.

7  Q.   And that's your only answer?

8  A.   Yes, sir.

9  Q.   Just so we're clear, there were acute findings in the

10  neuroradiology exams; is that right?

11  A.   Yes.  We went over those.

12  Q.   What's the threshold for causing retinal hemorrhages?

13  A.   I don't think anybody knows.  I don't know.

14  Q.   How long is the -- is there a duration of pressure to

15  cause the hemorrhages?

16  A.   Current thinking is that it's a sudden increase in

17  pressure.  So when there is a rapid rise in pressure, that's

18  what's going to cause the backup in the veins in the retina.

19  Q.   Now you're the one using dramatic terms.  You just said a

20  rapid rise.  What is any indication that there was a rapid rise

21  if there is no indication in any form from the Cushing's Triad

22  in this case?

23  A.   Again, you've got fluid in a place it doesn't belong, and

24  then out of the blue, you then have bleeding into that fluid.

25  That's going to increase the pressure.

1   Q.   Okay.

2   A.   But there was no indication of Cushing's Triad.

3   Q.   But you also agree that retinal hemorrhages could be from

4   trauma?

5   A.   Sure.  Accidental or abusive.

6   Q.   That subdural hematomas could be trauma?

7   A.   Accidental or abusive, yes, sir.

8   Q.   The acute subdural hematoma in this case could have

9   created an increased intracranial pressure?

10  A.   It might have.

11  Q.   You stated in your first interview that subdural hematoma

12  is the body's reaction to impact trauma?

13  A.   That's the number one most common cause for subdural

14  hematoma.  And again, the trauma to the head, of course.

15  Q.   Is your opinion that subdural hygromas are more or less

16  often caused from trauma?

17  A.   Are we including birth trauma or not?

18  Q.   Trauma.

19  A.   And are we talking about infants?

20  Q.   Infants.

21  A.   I think it really depends.  If we can follow the

22  progression of the head size from birth, then the most likely

23  cause is birth trauma.  And if we cannot, if we don't see a

24  head size acceleration until a few months after birth, then

25  there probably was a minor trauma that caused it.

1  Q.   Is it your opinion that "C" had an accelerated head

2  growth?

3  A.   Yes, sir.

4  Q.   So 75th percentile to the 90th percentile you would

5  consider accelerated head growth?

6  A.   Yes, sir.

7  Q.   And it's all a matter of what data point you pick, because

8  when he was born, he had a 98th percentile head; is that

9  correct?

10  A.   Yes, sir.

11  Q.   You never listed in your report, though, an acute subdural

12  hematoma, did you?

13  A.   I didn't use those words.

14  Q.   Or subarachnoid hemorrhage?

15  A.   I didn't use those words.

16  Q.   And I know you haven't used this term, but I just want to

17  understand.  Are you saying that your subdural hygroma would

18  have caused an acute subdural hematoma through a re-bleed?

19  A.   I didn't use the term re-bleed, but some people might use

20  that term.  A re-bleed just means a leaky membrane.  I didn't

21  use that term.

22  Q.   But is that essentially what you're saying, that the

23  subdural hygroma caused the bleed that led to the acute

24  subdural hematoma?

25  A.   I'm sorry; could you ask the question again?

1   Q.    I mean, you didn't use the term re-bleed, but is that

2   essentially what you're saying, that the subdural hygroma bled

3   causing the acute subdural hematoma?

4   A.    So, re-bleed implies that there was an original bleed.  So

5   let's pretend we have a completely different case, not "C."  A

6   child falls off the porch --

7   Q.    Go ahead.

8   A.    I'm just trying to explain.  I don't have to.

9   Q.    Go for it.

10  A.    If a child falls off the porch and gets an acute subdural

11  hematoma, and then six months later in that spot has a new

12  acute subdural hematoma without any new trauma, that's a

13  re-bleed.  There was an old bleed and now there's a new bleed.

14        I don't know that "C" ever had an original acute subdural

15  hematoma before the events at eight months old.

16  Q.    So now I feel like we've started back at square one with

17  you, Dr. Scheller.  You have not provided any evidence that

18  this hygroma came from anything other than a traumatic event;

19  is that correct?  And your evidence says that you were saying

20  that this is a birth trauma?

21  A.    I can't agree with either one of those, but I'm happy to

22  elaborate.

23  Q.    What is your diagnosis for "C.A."?  What is it?  What

24  caused his injury?

25  A.    He had a chronic subdural hygroma either caused by birth

1  or caused by some unknown event in the first few months of life

2  that then had a complication when he was eight months old,

3  bled, caused a seizure, and that was the end of the story.

4  Q.   What evidence was there of anything other than trauma for

5  "C.A."?

6  A.   The fact that there was no evidence of trauma anywhere

7  near the head.

8  Q.   So then you disagree with the consensus statement, this is

9  Government's Exhibit 8, that subdural -- under the Birth Trauma

10  section, it indicates that no evidence at birth subdural

11  hemorrhages cause re-bleeds?

12  A.   I didn't use the term re-bleed, but I definitely disagree

13  with the consensus statement.  So that's fine.

14          MR. MARSHALL:  Okay.  No further questions, Your

15  Honor.

16          THE COURT:  Is there redirect?

17          MR. KOCHERSBERGER:  Nothing further, Your Honor.

18          THE COURT:  All right.  Dr. Scheller, thank you.  I

19  know you traveled in from somewhere on the East Coast.

20          THE WITNESS:  I've got a whole bunch of exhibits

21  here.  I don't want them to get lost.

22          THE COURT:  Why don't you just put them on the bench

23  right there, and I'll let counsel sort through them.

24          MR. MARSHALL:  Your Honor, I'm not sure which numbers

25  they were, but I would ask to move in the articles we mentioned

1   today, the Rooks article and -- Wittschieber is already in.  So

2   Rooks is the only new article.  I'd ask to move that in as

3   evidence, or at least to be a part of the record.

4           MR. KOCHERSBERGER:  I have no objection, Your Honor,

5   but I will note that the original Notice, the documents that

6   are in the binder, attached to the one that was No. 20, the

7   Rooks article is there.  So if we admitted 20, the Rooks

8   article may be appended to the exhibit that originated from 20.

9           THE COURT:  Is it Defendant's Exhibit 20?

10          MR. KOCHERSBERGER:  No, it would have been the Notice

11  No. 20.  It was one of the K.S. Lee articles, and I believe --

12  I think it's No. 33.  It actually has the Rooks article in it.

13  I just discovered that earlier.  Let me make sure.

14          Yes, Defense Exhibit No. 33 is actually the K.S. Lee

15  article and the Rooks article.  So it's in there that way.  It

16  just got there by mistake.

17          THE COURT:  Should it be a separate exhibit?

18          MR. KOCHERSBERGER:  I can pull it out of this and

19  make it -- do you want me to call it a Defendant's exhibit?

20          MR. MARSHALL:  It was used in cross, so I'd prefer

21  that it was a Government's exhibit.  I'm not sure what number

22  we're on.  30 or 31.

23          MR. KOCHERSBERGER:  I think you should be on 30.

24          THE COURT:  You don't object; right?

25          MR. KOCHERSBERGER:  I do not object.

1     THE COURT:  Okay.  Then it will be -- what's the last

2  number?  All right, Government's Exhibit 31 is admitted.

3     (Government Exhibit No. 31 admitted.)

4     THE COURT:  All right, I entered an order.  Did you

5  all see that order yet?

6     MR. KOCHERSBERGER:  Yes, sir.

7     MR. MARSHALL:  No, Your Honor.

8     THE COURT:  I'll wait until Mr. Marshall finishes.

9     Now, I'm assuming you're going to order a transcript

10  from this hearing.

11     MR. MARSHALL:  Yes, Your Honor.

12     THE COURT:  So what I thought is, in terms of the

13  written closings, two weeks from when the transcript is

14  completed for the Government, and then defense will have two

15  weeks to respond, and then if the Government wishes, a week to

16  do a reply.  Now, is that realistic?

17     I'm just trying to -- again, this case, we've got to

18  move this case forward, and so that's the schedule.  Because

19  then I've got to have some time to sort through all of this.

20  And then, as you see in that order, I'm requiring you to cite

21  to places in the record.

22     Now, if you all confer and if you need an additional

23  week, I have no issue with doing a stipulation where the

24  Government gets three weeks, and then the defense gets three

25  weeks, if you all feel like you need that.

1                    All right, anything else for today?

2               MR. MARSHALL:  No, Your Honor.

3               MR. KOCHERSBERGER:  No, Your Honor.

4               THE COURT:  Then we will be in recess.  Thank you.

5    (Proceedings adjourned at 3:13 P.M.)

6                         *  *  *  *  *

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF NEW MEXICO

3    _____
                               )
4    UNITED STATES OF AMERICA,  )
                               )
5            Plaintiff,         )
                               )
6        vs.                    )   No. NO. 1:14-CR-03762-WJ
                               )
7    PATRICK DURAN,             )   Daubert Hearing - Vol. 3
                               )
8            Defendant.         )
     _____)

9

10        CERTIFICATE OF OFFICIAL COURT REPORTER

11       I, Mary K. Loughran, CRR, RPR, New Mexico CCR #65, Federal

12   Realtime official Court Reporter, in and for the United States

13   District Court for the District of New Mexico, do hereby

14   certify that pursuant to Section 753, Title 28, United States

15   Code, that the foregoing is a true and correct transcript of

16   the stenographically reported proceedings held in the

17   above-entitled matter on Monday, August 26, 2019, and that the

18   transcript page format is in conformance with the regulations

19   of the Judicial Conference of the United States.

20   Dated this 6th day of September, 2019.

21

22   _____
     MARY K. LOUGHRAN, CRR, RPR, NM CCR #65
23   UNITED STATES COURT REPORTER
     333 Lomas Boulevard, Northwest
24   Albuquerque, New Mexico  87102
     Phone:  (505)348-2334
25   Email:  Mary_Loughran@nmcourt.fed.us